# UNITED STATES DISTRICT COURT
## District of Massachusetts

| | |
|---|---|
| MANUEL ROBERT LUCERO V,<br>Plaintiff,<br><br>v.<br><br>LEWIS G. EVANGELIDIS,<br>THOMAS A. TURCO III,<br>CORRECT CARE SOLUTIONS,<br>*individually and in their*<br>*official capacities,*<br>Defendants. | U.S. DISTRICT COURT<br>Civil Action No.<br><br>**COMPLAINT**<br><br>*JURY TRIAL DEMANDED* |

## *COMPLAINT*

Plaintiff, **MANUEL ROBERT LUCERO V**, *pro se*, for their complaint state as follows:

### I. JURISDICTION AND VENUE

1. This action arises under and is brought pursuant to 42USC§1983 to remedy the deprivation, under color of state law, of the rights guaranteed by the First, Eighth, and Fourteenth Amendments to the United States' Constitution. This court has jurisdiction over this action pursuant to 28USC§1331 and 28USC§1343.

2. Plaintiff's claim for injunctive relief is authorized by Rule 65 of the Federal Rules of Civil Procedure; Plaintiff claims declaratory judgement purusant to 28USC§2201.

3. This cause of action arose in the central division of the United States' District of Massachusetts. Therefore, venue is proper under 28USC§1391(b).

### II. PARTIES

4. Plaintiff, **MANUEL ROBERT LUCERO V**, has been and is currently detained at the Worcester County Jail and House of Corrections (WCJHOC), as a pre-trial detainee, located at 5 Paul X. Tivnan Drive, in the town of West Boylston, of the Commonwealth of Massachusetts.

5. The following individuals and corporation, individually and in their official capacities, are defendants:

    A) Defendant, **LEWIS G. EVANGELIDIS**, who was, at all times relevant herein, the Sheriff of Worcester County. His principal office is located at 5 Paul X. Tivnan Dr., in West Boylston, Massachusetts.

    B) Defendant, **THOMAS A. TURCO III**, who was, at all times relevant herein, the Commissioner of Corrections within the Commonwealth of Massachusetts' Executive Office of Public Safety and Security. His principal office is located at 50 Maple St., Suite# 3, in Milford, Massachusetts.

    C) Defendant, **CORRECT CARE SOLUTIONS**, who was, at all times relevant herein, the healthcare agency providing services to all inmates, under color of state law, within the WCJHOC. **CORRECT CARE SOLUTIONS** is a corporation with it's principal place of business in, and incoporated under the laws of, the State of Tennesee. Its principal office is located at 1283 Murfreesboro Road, in Nashville, Tennessee.

### III. LAWSUITS BY PLAINTIFF

6. Plaintiff has filed no other lawsuits dealing with the same facts involved in this action or otherwise relating to his detainment.

### IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

7. On June 26, 2017, plaintiff submitted a handwritten grievance via in-house mail [see 'Exhibit 001'] describing his inability to personally inspect his medical records under policy, due to the fact that a Lieutenant Crandall told him "You can't grieve medical in any way, shape, or form.", and denied him a signed proper grievance form in violation of 103CMR934.02 [see 'Exhibit 002'].

8. The response time for this grievance had expired on July 6th, 2017, as per 103CMR491.10. Plaintiff took the lack of response as a denial and submitted an appeal to the

grievance [see 'Exhibit 003'] via in-house mail on July 11th, 2017.

9. On July 11th, 2017, plaintiff requested a grievance from Officer Byrnes. Lieutenant Crandall came to authorize the grievance as per facility policy. Lieutenant Crandall told plaintiff, "Boy, you just want to grieve everything." He denied plaintiff proper grievance forms once again.

10. Even though at this point it appears to plaintiff that the grievance process is unavailable to him, and thusly administrative remedies exhausted, plaintiff nevertheless submitted a packet of handwritten grievances [see 'Exhibit 004'] pursuant to emergency grievance procedures in 103CMR491.11 addressed to the Grievance Coordinator of the facility, to which he has three days to respond, via in-house mail the same day. Handwritten grievances by plaintiff have been accepted and formally processed in the past without officer authorization.

11. On July 14th, 2017, plaintiff sent out letters contacting defendants **LEWIS G. EVANGELIDIS,** and **THOMAS A. TURCO III,** regarding the facility's deficiencies [see 'Exhibit 005'].

12. Plaintiff contacted the Office of the Attorney General [see 'Exhibit 006'] in regards to the conditions of his confinement, with a copy of the letter sent to the Office of the Governor; Special Sheriff David H. Tuttle [see 'Exhibit 007'], receiving a copy of the letter sent to **EVANGELIDIS;** and, **CORRECT CARE SOLUTIONS,** in the form of a demand letter in accordance with M.G.L. c. 231, §60L regarding the misconduct and inadequate medical care in the facility under their responsibility.

13. On July 14th, 2017, plaintiff was approached by the grievance coordinator and investigator, John Sables. Sables had received plaintiff's grievances and had said that they were informally processed, however formal forms were required per policy. After hearing of the complications with Lieutenant Crandall, he indicated that he would have a different lieutenant come up to provide the forms.

14. On July 17th, 2017, plaintiff was called upon by Deputy Superintendent Hines and Lieutenant Foulkrod in the presence of Sergeant Monroe and Officer Culley. He explained his issues to the Lieutenant as well as his conversation with Investigator Sables. The Lieutenant and Deputy Superintendent got noticably aggravated by his explanations of various unconstitutional conditions of his confinement. The Deputy Superintendent stated "I make the rules. If you want us to play by every single rule, then I'll make sure they work in any favor

3

but yours." Then, the Lieutenant proceeded to say "Don't take this as a threat. I'll give you as many grievances as you want, but no one here is going to like the results." It was not until plaintiff insisted that he would take his chances with the grievance procedure, that Sergeant Monroe had the forms printed and the Lieutenant signed them. They were submitted formally via in-house mail, the same day.

15. Plaintiff received an envelope from Special Sheriff David H. Tuttle on July 18th, 2017, that simply read "not acceptable" [see 'Exhibit 008'] and contained photocopies of his grievance regarding access to his records. Plaintiff assumes that this is indicative of a denial.

16. Seven out of the eight of plaintiff's 'emergency grievances' were denied on July 27th, 2017 [see 'Exhibit 009']; this is beyond the time allocated to respond to emergency grievances. Nevertheless, plaintiff submitted appeals the same day via in-house mail (It should be noted that the Internal Grievance Coordinator altered the original grievances when quoting them in his denial)[see 'Exhibit 010'].

17. Seven out of the eight of plaintiff's appeals were denied on August 1st, 2017 [see 'Exhibit 011']. Plaintiff has not received an initial or appellate response to the grievance regarding access to his medical records. This exhausts all facility remedies available to plaintiff.

18. Plaintiff did not receive an answer to his letter to **CORRECT CARE SOLUTIONS** as of August 3rd, 2017.

19. Plaintiff did not receive an answer to his letter to **THOMAS A. TURCO III** as of August 3rd, 2017.

20. Plaintiff did not receive an answer to his letter to **LEWIS G. EVANGELIDIS** as of August 3rd, 2017.

21. Plaintiff did not receive an answer to his letter to David H. Tuttle as of August 3rd, 2017.

22. Plaintiff did not receive an answer to his letter to the Office of the Attorney General as of August 3rd, 2017.

23. Plaintiff did not receive an answer to his letter to the Office of the Governor as of August 3rd, 2017.

24. Plaintiff contends that a lack of timely responses via mail is due to the inhibition of his outgoing mail by the administration in violation of federal law and retaliation for the filing of so many grievances as well as the subsequent rise of this action.

## V. STATEMENT OF CLAIM

25. At all relevant times herein, defendants were "persons" for the purposes of 42USC§1983 who were made aware of the unconstitutional conditions of plaintiff's pre-trial detainment and nevertheless refused to execute their duties of inspection, enforcement, maintenance, and care even to such a degree that violates numerous standards established by law and statute to facilitate the fair treatment and constitutional detainment of plaintiff as a pre-trial inmate; and whilst acting under color of state law, have failed to provide the basic necessities of life, including warmth, safety, sanitation, and access to adequate medical care. This has resulted in incontrovertible risks to plaintiff's welfare, including a possibly life-threatening infection, disfigurement, and significant emotional distress, as explained more fully herein.

## VI. FACTS OF UNCONSTITUTIONAL CONDITIONS OF HEALTH AND SAFETY

26. Plaintiff has been housed in the Annex Building since his detainment at the WCJHOC with brief periods of temporary reassignment, intermittently, since March 28th of 2016.

27. All facts regarding the condition within the WCJHOC have been chronically present and continue as of the time of filing.

28. Defendants have and continue to fail to enforce, maintain, or inspect for compliance with applicable Codes of Massachusetts Regulations (CMRs) within the WCJHOC in such a way that places the health, safety, and basic liberties of plaintiff in substantial danger, violating the Eighth and Fourteenth Amendments to the United States' Constitution, as applicable to plaintiff as a pre-trial detainee and a citizen of these United States.

29. The Annex Building is a housing unit for unconvicted detainees in protective custody, that was built after the effective date of 105CMR451; this building contains a dormitory area that is less than the required habitable space of 105CMR451.322: "Each dormitory in a new facility or a part of a facility constructed after the effective date of 105CMR451.000, should

contain a minimum of 60 square feet for each occupant..." [see 'Exhibit 012'].

30. At capacity, the Annex Building houses 100 pre-trail detainees without further accomodation being necessary. As of June 20th, 2017, there are 92 inmates housed within the Annex Building.

31. The 'dormitory area' of the Annex Building, consists of 50 two-person bunks arranged in close proximity to one another [see 'Exhibit 013']. (at best estimates, about four feet away on the three sides not touching another bunk, wall, or an area only accessible through permission from staff).

32. Even if one considers the common toilet fixture area in summation with the 'dormitory area', it still would be insufficient to satisfy the 6,000 square feet mandated by the minimum health and sanitation standards of 105CMR451.322, which is applicable to all correctional institutions.

33. Furthermore, even if we were to consider the entire side of the Annex Building's 'dormitory area', rather than the actual area itself, all inmates, including plaintiff, are restricted to the area immediately surrounding their bunk for a majority of the day, or else they suffer both formal and informal disciplinary action by correctional staff.

34. The 'immediate bunk area' is about 60 square feet per two-man bunk, at the most liberal approximations, which would violate codes regulating the dimensions of a two-man cell, let alone space that must be shared by the 8 inmates bunked within this 'immediate bunk area'. The indifference to health, safety, and sanitation here is evident.

35. Upon arrival to the WCJHOC, plaintiff received only two shirts, two pairs of socks, two boxers, two sheets, two towels, two sets of uniforms, a reusable plastic cup, a disposable hygiene kit, a soft-plastic tote bag, and an inmate orientation handbook.

36. 105CMR451.102 requires that "Each inmate shall be supplied with two clean sheets, a pillow, pillow case, two towels and a washcloth..." [see 'Exhibit 014'].

37. In what one would presume to be an attempt to cut expenses, the Worcester County Sheriff's Office (WCSO) has failed to meet the minimum health and sanitation standard concerning the provision of sufficient linens, pillows, and towels to plaintiff.

38. Upon arrival to the Annex Building on March 28th, 2016, plaintiff received a dilapidated and torn plastic and foam mattress that appeared to be extremely dirty and was no thicker than the width of his fist when not laid upon. All mattresses that he has seen in other units of the WCJHOC are in similar, if not worse, condition.

39. Plaintiff has never, in periods exceeding three months, been given an opportunity to have his mattress cleaned or replaced. There is also no formal or informal policy facilitating such opportunities.

40. The WCSO thusly violates 105CMR451.103 ("Each inmate shall be supplied with a clean and comfortable fire-resistant mattress in good condition... Each mattress pad shall be cleaned at least every three months, or more often if needed.") [see 'Exhibit 015'].

41. During times such as 'bunk restrictions' and/or counts, plaintiff has been verbally reprimanded by multiple officers and threatened with disciplinary action for being "out-of-place" when utilizing the toilets or handwashing sinks that are shared amongst those housed in the Annex Building. This was not an issue in other units where plaintiff was housed in a cell. This may indicate the differential treatment of inmates in Protective Custody.

42. On July 9th, 2017, an officer spoke over the intercom of the Annex Building saying that all inmates had "two minutes to finish up in the toilets" immediately prior to the 1830 count.

43. At minimum, this indicates an informal policy violating 105CMR451.112 ("Each inmate and [employee] shall have access to a toilet and handwash sink at all times.") [see 'Exhibit 016'].

44. In the Annex Building, there are showers which have a single actuating button that dispenses scalding hot water. There is absolutely no way for the inmate to control the relative water temperature or to know the temperature of the water prior to having to suffer it.

45. Other units that plaintiff has been housed in, contain relative temperature control knobs. This may further indicate differential treatment of inmates in Protective Custody due to the sensitive and serious allegations against them.

46. This is incontrovertibly non-compliant with 105CMR451.119 ("Each facility shall have at least one shower or bathtub with hot and cold running water for the first twelve inmates, and

then one for each additional fifteen inmates.") [see 'Exhibit 017'].

47. In the entire length of his detainment, plaintiff has neither participated in, nor heard of, the execution of a fire-safety or emergency evacuation drill, despite recent constructive improvements on the interior of the Annex Building, including the open welding of interior walls in the inmate 'bunk area', the use of a concrete saw to saw through steel in the inmate 'bunk area', and frequent electrical outlet shortages.

48. This practice violates the required safety standard of 103CMR937.02 ("Each county correctional facility shall have a written evacuation plan prepared in the event of a fire or major emergency. This plan shall be approved by the public safety authority having jurisdiction... (4) The plan shall include, but not be limited to the following:... (d) At least quarterly drills in all locations;...") [see 'Exhibit 018']. The very day that plaintiff received the denial of his grievance pertaining to this issue, a fire/emergency drill was enacted for the first time in about one and a half years.

49. On or about July 9th, 2017, a Sergeant Adam Sweeney, a regular supervising officer of the Annex Building, confiscated an extra blanket from the top of plaintiff's mattress that plaintiff had obtained from an inmate returning home, as inmates are not provided with even a single extra blanket despite their requests to correctional officers when indoor temperatures are low from the frequently excessive use of climate controls by staff.

50. Warmth is a basic necessity of life and 105CMR470.102(a) dictates "Sufficient blankets shall be provided upon request to maintain the warmth of any detainee..." [see 'Exhibit 019']. This presents an obvious health risk.

51. During the winter months, the climate is frigid. However, the WCSO has made no attempts to ensure the health of inmates. Plaintiff has been forced to suffer cold weather and, being a prior resident of Central California, is not acclimated to such weather. It also shocks the conscience that other units receive bright orange wool-lined coats for recreation in the winter months, however these are not available to inmates in the Annex Building.

52. Correctional staff frequently claim that the Prison Rape Elimination Act (PREA) requires all inmates to suffer, in the Annex Building, to wear a full-uniform at all times, even during the hot and humid weather of the summer months, where wearing the double layers of denim and cotton of the WCSO uniform is not objectively reasonable to adhere to for concern of one's

8

health, thereby discouraging individuals from engaging in recreation, especially when indoor climate controls fail in the Annex Building, lest they receive disciplinary action.

53. This violates 105CMR451.210 ("Each inmate shall be furnished with proper clothing to preserve health and comfort at all times of year, [if his own wardrobe is not permitted], or not adequate for these purposes.") and presents a severe risk to health and safety [see 'Exhibit 020'].

54. These obscene conditions objectively constitute punishment that is cruel or unusual (violating the VIII Amendment) and are being imposed upon citizens who are solely detained for the purposes of being transported to the court in which they are charged and are thusly unconvicted of any crime (in violation of the XIV Amendment).

55. Multiple affiant-witnesses have provided affidavits in support of the facts contained herein through statement of their experiences under the same status, in the same facility, and at the same times as plaintiff [see 'Exhibit 021' through 'Exhibit 027']. The WCSO, however, did not make a notary public available, as will be more fully explained in the next section.

## VIII. FACTS OF UNCONSTITUTIONAL DENIAL OF ACCESS TO THE COURTS

56. In attempting to access an electronic law library (which is the method decided by the institution to facilitate access to the courts to provide a means to research laws, rules, and opinions in lieu of providing free lawyers or paraprofessions to prepare legal papers woth some modicum of legal proficiency) so that he may find information as to the elements of the allegations against him and to research how he may challenge the noticably deficient conditions of his confinement, plaintiff was denied access by multiple correctional officers, including a Sergeant Ovian, on or about February 21st, 2017. Roughly three days later he received a single hour of access.

57. Don Siergie, who is the Director of Inmate Services, indicated to plaintiff that it is policy that he must wait 48 hours after submitting yet another written request to receive another hour of access to the electronic law library.

58. The electronic law library is a LexisNexis software interface (by Matthew Bender & Company) on a Lenovo personal computer without any plausible access to the internet and is locked inside of the 'social worker's office' and is only removed for use, by the social worker,

9

for certain inmates (for one or two hours at a time) between the hours of about 0900 to 1400, on average, three days a week.

59. Being that there are 100 inmates in the Annex Building, at capacity, this single computer with all the restrictions imposed on access to it has considerably inhibited access to the courts for plaintiff and other inmates in the sense that it may prevent the timely adherence to certain rules of procedure and definitely has not given plaintiff enough time to be legally proficient enough to render efficacious *pro se* litigation against the conditions of his confinement, or petition the court for a redress of grievances (in violation of the First Amendment).

60. Plaintiff was denied access to free photocopies on July 13th, 2017, by Dean Cavaretta, an inmate services counselor, who was instructed by his superior, Don Siergie, to do so. This is further inhibition of access to the courts and a probable retaliation against the plaintiff exercising his right to grieve the conditions of his confinement.

61. There are no typewriters or word processors available in the Annex Building, hence why plaintiff is forced to request the free aid of an outside typist in the hopes that the courts will deem the format as acceptable.

62. On June 30th, 2017, plaintiff requested access to the law library to research case law pertinent to his defense in Worcester County Superior Court, however, as of July 5th, 2017, plaintiff had not been granted such access. Plaintiff contends that this is due to a grievance being filed and such a denial of access is a common mode of retaliation utilized by the facility administrators.

63. The inhibition of legal access violates 103CMR934.01(4) "Written policy and procedure shall provide for a program designed to assist inmates in the preparation and filing of legal papers. Such a program shall meet the minimum requirements for legal assistance programs required by [Law]. The program shall consist of one of the following: (a) a law collection containing legal materials as required by [Law], and the required equipment and supplies to prepare legal papers...") [see 'Exhibit 028'].

64. Denial of access to free photocopies is one of the many violations of 105CMR478.11 [see 'Exhibit 029'].

65. On August 1st, 2017, at about 0945, plaintiff was called into the 'social workers' office' and spoke to Don Siergie in the presence of Sergeant George Monroe (in a manner that placed him in a position of severe anxiety due to the threatening nature of the encounter). Siergie got on the phone with Superintendent David H. Tuttle and the both informed plaintiff that any affidavits or other documents that he, or others who they are aware of who might be signing affidavits in support of plaintiff, has requested to be notarized (by an individual named "Kathy") will be denied that request indefinitely.

### IX. FACTS OF UNCONSTUTIONAL DENIAL OF ACCESS TO ADEQUATE MEDICAL CARE

66. Upon arrival to the WCJHOC, plaintiff was given an initial medical screening by one of the nurses contracted with **CORRECT CARE SOLUTIONS**, prior to being placed in any housing assignment. Despite plaintiff indicating in the screening that he had tooth pain indicative of a cavity, plaintiff was never given a full physical examination (until exactly one year later) or referred to the dentist.

67. The lack of a comprehensive physical assessment presents a gross indifference to plaintiff's health and violates 103CMR932.07(1) ("Pursuant to M.G.L.c.127, §16, each inmate committed to the facility for 30 days or more shall receive a thorough physical examination. Said examination shall take place no later than seven days after admission...") [see 'Exhibit 030'].

68. On June 22nd, 2017, plaintiff completed a healthcare request form for the health agency, **CORRECT CARE SOLUTIONS**, to allow him to personally inspect his medical records. The next day, an individual with the initials 'Bt' had indicated that he was unable to personally inspect his medical records and that a Release of Information was necessary so that it may be inspected by someone other than plaintiff once it is placed in his property in a disk format, which is inaccessible to plaintiff during his detainment [see 'Exhibit 031'].

69. This presents a serious issue that places not only the plaintiff's health at risk but also his privacy and the knowledge of his own care. Such policies violate 105CMR205.505 ("Medical records may be inspected by the inmate to whom they relate, by his/her attorney, or by any other person upon written authorization of the inmate... Copies of such records shall be furnished within 72 hours of request...") [see 'Exhibit 032'].

70. In the month of June, 2017, an inmate by the name of Victor Rios, presented a

complaint to the nursing staff of **CORRECT CARE SOLUTIONS** durin medication pass, as well as to multiple WCSO correctional officers, that he was experiencing chest pain. At or about 0600, the next day, Mr. Rios had a cardiac emergency in which he stopped breathing, had no pulse, and was unresponsive to both vocal and pain stimuli.

71. Correctional officers Sergeant Briscoe, Lieutenant Crandall, Officer Fortin, Officer Hill, Officer Lynch, Officer Culley, Officer Feliz, Officer Bissel, and Sergeant Romano were all present at one point or another throughout the incident.

72. Officer Fortin was the first individual to Mr. Rios' bunk as he began experiencing what appeared to be a tonic-clonic seizure. Mr. Rios then went still with labored breathing in strokes that are universally indicative of cardiopulmonary dysfunction, and she waited approximately five minutes before telling another officer to contact the medical department. By then, Mr. Rios had stopped breathing completely.

73. Within ten minutes, more correctional staff arrived, and during this entire time, no correctional officer even attempted to initiate Cardiopulmonary Resuscitation (CPR).

74. Plaintiff, who is trained in CPR as well as the United States' Army's Combat Life-Saving program, and another inmate who is an inactive Massachusetts' and National Registry of Emergency Medical Technicians' licensed Paramedic (NREMT-P: the highest level of rank, skill, and competence in pre-hospital medical care; scope of practice includes, but is not limited to electrocardiograph interpretation, advanced pharmacology, and the field preformance of invasive surgical procedures), and an active holder of an advanced CPR for Healthcare Providers and Advanced Cardiac Life Support certifications, had attempted to provide life-saving maneuvers (including CPR) to Mr. Rios, however they were told by Officer Fortin to "Shut up and stay back or else you're getting lugged [to the Hole]."

75. Approximately ten minutes had passed with Mr. Rios' lack of spontaneous breathing and the lack of any sort of resuscitative efforts being attempted by correctional staff. The odds of successfully resuscitating a patient, out-of-hospital after 10 minutes of no CPR or basic life support, are morbidly low due to ischemic damage and total organ failure. If plaintiff, or the inmate/healthcare provider, was allowed to provide, at minimum, basic life support to Victor Rios immediately, as such maneuvers were indicated, then his chances of survival would have increased to beyond likely.

76. Unfortunately, Victor Rios died after being placed on mechanical life-support in a 'vegetative state' due to permanent brain damage probably resultant from the inadequate responses by facility staff and the medical incompetence of the nurse who arrived to the scene minutes later.

77. A nurse from **CORRECT CARE SOLUTIONS** arrived to the Annex Building to respond to Mr. Rios' cardiac emergency before any emergency services had arrived. The nurse initiated what appeared to be CPR, however was far outside the standards of the current guidelines and highlights (2015) of the American Heart Association's CPR certification, which is required of all Healthcare Providers (or its equivalent) in Massachusetts. Plaintiff witnessed the nurse completing varying numbers of chest compressions (between seven and sixteen) before instricting a correctional officer to administer mouth-to-mouth ventilation when standards indicate thirty chest compressions at a rate of 100 per minute and two ventilations after each cycle of compressions, for adults.

78. The inmate/HCP was Adam Walker, whose affidavit is attached [Exhibit 021].

79. The nurse had obtained a Bag-Valve Mask (BVM) and an Automated External Defibrillator (AED) taht was readily accessible to correctional staff in the Annex Building and yet waited until all inmates were moved to the other side of the building before applying its two leads and powering on the machine, just another example of either a lack of CPR training or the incompetence of both nurses and correctional staff.

80. This incident exemplifies the presence of substantial risks to plaintiff's life, health, and safety in the event of a medical emergency. **CORRECT CARE SOLUTIONS** and the WCSO have inhibited plaintiff's access to adequate medical care by providing poorly trained and/or untrained staff who have proven themselves to be inefficacious in emergency situations to such a degree as to become directly culpable for the death of an inmate. Inmates who are provably more well-trained are denied the right to be a "good samaritan" and save the life of another inmate.

81. The entire incident of Mr. Rios' emergency and consequential death, challenged plaintiff in whether or not the provision of life-support despite the unfair consequences of extreme disciplinary action was the right thing to do. Mr. Rios' death and the staff's ultimatum that prevented plaintiff from saving his life, has caused immense mental distress and emotional trauma due to the challenges of moral relativism present in this case.

82. The lack of proper training of correctional staff violates 103CMR932.05(1) ("Written policy and procedure shall provide for the training of other personell to respond to health-related situations. This shall include the establishment of a training program by a responsible health authority in cooperation with the facility administration, which includes instruction in the following areas: (a) the ability to respond to health-related situations within four minutes; (b) recognition of signs and symptoms, and knowledge of action required in potential emergency health care; (c) administration of first-aid and [CPR](to be documented by a copy of the current certification placed in individual training recoprds); (d) methods of obtaining assistance; (e) recognition of signs and symptoms of mental illness, retardation, emotion disturbance and chemical dependency; (f) procedures for inmate transfer to appropriate medical facilities or healthcare providers.") [see 'Exhibit 033'].

83. By not providing adequate medical care and failing to inspect or correct the inadherence to standards of regulations meant to ensure the basic necessities of life, including adequate medical care, defendants have violated plaintiff's Eight and Fourteenth Amendment protections as depicted further herein.

84. As of July 5th, 2017, plaintiff has a total loss of tooth due to an infection created and amplified by an untreated cavity that he indiicated upon his initial medical screening. He has experienced severe pain and ultimate deformity as a result of this infection.

85. Plaintiff has been held for over a year without any dental interventions or antibiotic treatments. Plaintiff contends that this is due to his housing assignment in Protective Custody and the sensitive nature of the charges against him.

86. Swelling of the gums, bleeding, and even the inability to chew has been expressed repeatedly, however healthcare requests, both formal and informal, have gone unresolved.

87. Plaintiff currently experiences stiffness of the neck and is unable to fully extend his knees, possibly indicative that the infection has spread to the meninges or other neurological tissues. The infection, in this case, is quite possibly life-threatening, however this does not spur **CORRECT CARE SOLUTIONS** into action, despite objective signs of infection, such as fever and vital signs indicative of increase vessel permeability.

88. Total loss of dental tissue has forced plaintiff into permanent deformity of the

mouth.

89. During informal expressions of his dental issue, plaintiff was told by both medical and correctional staff that the only treatment of cavities within the facility is extraction, resulting in the unnecessary deformity of plaintiff and the destruction of viable, living tissue that could be saved by the simple filling or capping of a tooth.

90. Plaintiff contends that the cost is the primary motivation for providing inadequate dental treatment.

91. These dental policies violate 103CMR932.12 ("Written policy shall require the provision of dental care, under the direction of a dentist licensed in the Commonwealth to all inmates incarcerated for 30 days or more as follows: (1) Dental treatment, not limited to extractions, when the health inmate might be adversely affected;...") [see 'Exhibit 034'],

92. The WCSO and **CORRECT CARE SOLUTIONS'** policies and procedures regarding access to medical care considerably inhibit and adversely affect the health of plaintiff and other inmates. 103CMR932.08 requires that "Written policy and procedure shall provide for unimpeded access to healthcare...," [see 'Exhibit 035'] however policy requires that inmates cannot attend 'sick-call' without first indicating injury and/or illness on a Healthcare Request form and hand it to a **CORRECT CARE SOLUTIONS** staff member or place it in the designated receptacle, and then waith for the HCP conducting 'sick-call' to call upon the subject inmate's names before they can receive any medical care of any sort. If plaintiff attends 'sick-call' without a Healthcare Request form being filed 24 hours prior, then he is turned away.

93. This does not allow for inmates to present with urgent or emergent complaints to medical staff. Victor Rios' was turned away for this reason according to Nurse "Michael", an agent of **CORRECT CARE SOLUTIONS**.

94. Plaintiff has never been provided with the opporunity for nor ever given knowledge regarding the availability of special medical programs required by the Commonwealth of Massachusetts to ensure adequate access to medical care in correctional facilities. Specifically, a flu shot and immunization program.

95. 103CMR932.10(2) indicates that "Written policy and procedure shall provide, at minimum, the following special medical programs;... (d) medical preventive maintenance including

health education and medical services provided to take advanced measures against disease, such as inoculations and immunizations;..." [see 'Exhibit 036'].

96. Plaintiff seeks relief for damages due to permanent deformity resultant from loss of tooth, life-threatening risks to health resultant from medical negligence and the deliberate indifference of **CORRECT CARE SOLUTIONS'** staff and policies, loss of wages resultant from plausible future ailments sociable to the inadequate care received during his detainment, the debilitating pain of the severe infection of a tooth, compensation for the time spent under such unconstitutional conditions of confinement with their cruel and unusual dangers, emotional damages, future medical fees, and other such damages afforded to him under law or precedence.

## X. <u>CAUSES OF ACTION</u>

*DELIBERATE INDIFFERENCE TO INMATE HEALTH AND SAFETY*

97. In violation of the rights of plaintiff guaranteed by Amendments VIII and XIV, of the United States' Constitution, defendants, **EVANGELIDIS** and **TURCO** by failing to inspect, maintain, enforce, or correct formal and informal WCJHOC policies to the standards established by law to provide constitutional modes of detainment, have thusly offended as follows:

### COUNT I

98. Forcing plaintiff to live in a small space, even within an open dormitory or else receive disciplinary action despite the minimum health and sanitation code 105CMR451.322.

### COUNT II

99. Failing to provide plaintiff with clean, proper linens and towels according to the minimum standard of 105CMR451.102, in what appears to be an attempt at saving money.

### COUNT III

100. Neglecting to provide plaintiff with clean mattresses in good condition throughout his detainment despite the health requirements of 105CMR451.103, nor enforce any policy that would facilitate full compliance with this standard.

### COUNT IV

101. Permitting, at minimum, an informal policy that prevents plaintiff from utilizing

toilets or handwash sinks at certain times, in complete disregard of the state health code 105CMR451.112.

### COUNT V

102. Disregarding the fact that plaintiff has to suffer scalding water during showers due to a lack of both water controls and access to cold water in the facility showers, in violation of standards pursuant to 105CMR451.119.

### COUNT VI

103. Placing plaintiff's life in jepoardy by refusing to implement a single fire/emergency evacuation drill in about one and a half years, despite actual fires in the bulding and the safety code 103CMR937.02.

### COUNT VII

104. Facilitating the deprivation of warmth, a basic necessity of life, from plaintiff by violating 105CMR470.102(a).

### COUNT VII

105. Risking plaintiff's help to a severe degree, by forcing him to wear a full uniform of two layers of denim and cotton whilst exercising outdoors in the hot and humid summers, without regard to 105CMR451.210.

*GROSS DENIAL OF ACCESS TO THE COURTS*

106. In violation of the rights of plaintiff guaranteed by Amendments I and XIV, of the United States' Constitution, defendants, **EVANGELIDIS** and **TURCO** by failing to inspect, maintain, enforce, or correct formal and informal WCJHOC policies to the standards established by law to provide constitutional modes of detainment, have thusly offended as follows:

### COUNT I

107. Maintaining policies that inhibit plaintiff from being able to research laws, cases, definitions, and legal opinions in neither a timely nor efficacious manner.

### COUNT II

17

108. Instructing subordinates to operate in such a manner as to prevent plaintiff from photocopying legal documents pertaining to this action and its filing, violating 105CMR478.11.

### COUNT III

109. Endorsing policy that prevents plaintiff from being able to draft legal documents free of charge, in violation of 103CMR934.01.

### COUNT IV

110. Withholding access to a notary public so that plaintiff may properly authenticate legal documents.

*INHIBITION OF ACCESS TO ADEQUATE MEDICAL CARE*

111. In violation of the rights of plaintiff guaranteed by Amendments VIII and XIV, of the United States' Constitution, defendants, **EVANGELIDIS** and **CORRECT CARE SOLUTIONS** by failing to inspect, maintain, enforce, or correct formal and informal WCJHOC and medical department policies to the standards established by law to provide constitutional modes of detainment, have thusly offended as follows:

### COUNT I

112. Disregarding the regulation of 103CMR932.07 by failing to provide plaintiff with a thorough physical assessment upon arrival or refer the issue he indicated upon initial medical screening to the proper specialist.

### COUNT II

113. Violating plaintiff's right to personally inspect his own medical records pursuant to 105CMR205.505.

### COUNT III

114. Improperly training staff to respond to emergent medical situations in violation of 103CMR932.05(1).

### COUNT IV

115. Ignoring plaintiff's complaints of dental abcess and its correspondent pain and

18

swelling to such a degree that has led to the loss of living tissues.

### COUNT V

116. Threatening plaintiff with dental extraction *post facto* despite such a practice's violation of 103CMR932.12.

### COUNT VI

117. Implementing an inefficient and inadequate means to handle inmate medical complaints that is so insufficient that it has resulted in the death of an inmate.

### COUNT VII

118. Lacking any special programs for medically preventative maintenance services, including inoculations and immunizations, violating 103CMR932.10(2).

### XI. JURY TRIAL DEMANDED

119. Plaintiff demands a trial by jury in the resolution of all matters in this case that are so triable.

### XII. PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgement in his favor for:

A) Injunctive relief from the Honorable Court for all defendants to abolish policies, both informal and formal, which violate the constitutional rights of any pre-trail detainee under their care and confinement, as each infraction of state law is detailed herein, and to execute their respective duties as prescribed by statute and codes of regulation;

B) Declaratory relief to rule on the right of pre-trial detainees, such as plaintiff, to provide emergency medical care, or life-saving resuscitative efforts for which he/she is trained, to other detainees, and that no correctional facility policy can be construed to prevent one human being from saving the life of another, or suffer disciplinary action for doing so; and

C) Monetary relief through the Honorable Court, from **LEWIS G. EVANGELIDIS** and **CORRECT CARE SOLUTIONS**, in their official and individual capacities, for loss of wages, damages

from disfigurement, compensation for the unconstitutional conditions of his confinement for a period longer than one year, for the emotional distress of such risks and damages, and punitive damages for the risks to health and safety, in an amount no less than $15,000,000.00, including all attorney and Court fees, or whatever amounts the Honorable Court may deem just and proper.

All sufficient to compensate him for the pains, damages, and mental anguish suffered due to the deliberate indifference and substantial negligence of all defendants.

This complaint is made under the penalties and pains of perjury as the plaintiff swears that all facts are true.

Very Respectfully,

Manuel Robert Lucero V, pro se

08/03/2017

(MSA# 0704851)
5 Paul X. Tivnan Dr.
West Boylston, MA 01583