# UNITED STATES DISTRICT COURT
## District of Massachusetts

```
------------------------------X
MANUEL ROBERT LUCERO V,        :
     Plaintiff,                :
                               :
     v.                        :         U.S. DISTRICT COURT
                               :         Civil Action No.
LEWIS G. EVANGELIDIS,          :
THOMAS A. TURCO III,           :         _____
CORRECT CARE SOLUTIONS,        :
individually and in their      :         **AMENDED COMPLAINT**
official capacities,           :
     Defendants.               :         *JURY TRIAL DEMANDED*
------------------------------X
```

## *COMPLAINT*

Plaintiff, **MANUEL ROBERT LUCERO V**, *pro se*, for their complaint states as follows:

### I. JURISDICTION AND VENUE

1. This action arises under and is brought pursuant to 42USC§1983 to remedy the deprivation, under color of state law, of the rights guaranteed by the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States' Constitution. This Court has jurisdiction over this action pursuant to 28USC§1331 and 28USC§1343(a)(3).

2. Plaintiff's claim for injunctive relief is authorized by 28USC§§2283 & 2284 and Rule 65 of the Fed. R. Civ. Proc.; Plaintiff seeks declaratory judgement pursuant to 28USC§§2201 & 2202.

3. These causes of action arose in the central division of the United

1

States' District of Massachusetts. Therefore, venue is proper under 28USC§1391 (b)(2).

II. PARTIES

4. Plaintiff, **MANUEL ROBERT LUCERO V**, has been and is currently detained at the Worcester County Jail and House of Corrections (WCJHOC), as a pretrial detainee, located at 5 Paul X. Tivnan Drive, in the town of West Boylston, of the Commonwealth of Massachusetts.

5. The following individuals and corporation, individually and in their official capacities, are Defendants:

A) Defendant, **LEWIS G. EVANGELIDIS**, who was, at all times relevant herein, the Sheriff of Worcester County. His principal office is located at 5 Paul X. Tivnan Drive, in the town of West Boylston, of the Commonwealth of Massachusetts.

B) Defendant, **THOMAS A. TURCO III**, who was, at all times relevant herein, the Commissioner of Corrections in the Executive Office of Public Safety and Security. His principal office is located at 50 Maple Street, Suite 3, in the City of Milford, of the Commonwealth of Massachusetts.

C) Defendant, **CORRECT CARE SOLUTIONS**, who was, at all times relevant herein, the healthcare agency providing care to all inmates, under color of state law, within the WCJHOC. **CORRECT CARE SOLUTIONS** is a corporation with its principal place of business in, and incorporated under the laws of, the State of Tennessee. Its principal office is located at 1283 Murfreesboro Road, in Nashville, Tennessee.

III. LAWSUITS BY PLAINTIFF

6. Plaintiff has filed no other lawsuits dealing with the same facts

2

involved in this action or otherwise relating to his detainment.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

7. On June 26, 2017, Plaintiff submitted a handwritten grievance via in-house mail [*See* 'Exhibit 001'] describing his inability to personally inspect his medical records under policy, due to the fact that a Lieutenant Crandall told him "You can't grieve medical in any way, shape, or form," and denied him a proper grievance form in violation of 103CMR934.02 [*See* 'Exhibit 002'].

8. The response time for this grievance had expired on July 6, 2017, as per 103CMR491.10. Plaintiff took the lack of resonse as a denial and submitted an appeal to the Superintendent [*See* 'Exhibit 003'] via in-house mail on July 11, 2017.

9. On July 11, 2017, Plaintiff requested a grievance from Officer Byrnes. Lieutenant Crandall came to authorize the grievance as per facility policy. Lieutenant Crandall told Plaintiff, "Boy, you just want to grieve everything." He denied Plaintiff proper grievance forms once again.

10. Even though, at this point, it appears to Plaintiff that the grievance process is unavailable to him and, thusly, administrative remedies exhausted, Plaintiff nevertheless submitted a packet of handwritten grievances [*See* 'Exhibit 004'], pursuant to emergency grievance procedures in 103CMR493.11, addressed to the grievance coordinator of the facility, to which he has three days to respond, via in-house mail, on July 11. Handwritten grievances have been accepted by the facility in the past year from Plaintiff. There is a prior court statement in the Worcester County Superior Court with Judge Daniel Wrenn presiding, where WCJHOC administrators indicated that, contrary to what is indicated in the handbook, inmates do not require forms to file a grievance. [*See* 'Exhibit 037']

11. On July 14, 2017, Plaintiff sent out letters contacting **THOMAS A. TURCO III** and **LEWIS G. EVANGELIDIS** regarding the facility's deficiencies [*See* 'Exhibit 005'].

12. Plaintiff contacted the Office of the Attorney General [*See* 'Exhibit 006'] in regards to the conditions of his confinement, as a letter of presentment, with a copy of the letter sent to the Office of the Governor; Special Sheriff David H. Tuttle [*See* 'Exhibit 007'] receiving a copy of the letter sent to **EVANGELIDIS**; and, **CORRECT CARE SOLUTIONS**, in the form of a demand letter, in accordance with M.G.L.c. 231, §60L regarding the misconduct and inadequate medical care present in the WCJHOC.

13. On July 14, 2017, Plaintiff was approached by the grievance coordinator, Investigator John Sables. Sables had received Plaintiff's grievances and had said that they were informally processed. However, he stated that formal forms were required. After hearing of the complications with Lieutenant Crandall, he indicated that he would send a different lieutenant to provide the forms.

14. On July 17, 2017, Plaintiff was called upon by Deputy Superintendent Hines and Lieutenant Foulkrod in the presence of Sergeant George Monroe and Officer Culley. He explained his conversation with Investigator Sables. The Deputy and Lieutenant became noticably aggravated by his explanation of the unconstitutional conditions of his confinement. The Deputy Superintendent stated, "I make the rules. If you want us to play by every single rule, then I'll make sure they work in any favor but yours." Then Lieutenant Foulkrod proceeded to say "Don't take this as a threat. I'll give you as many grievances as you want, but no one here is going to like the results." It was not until Plaintiff insisted that he would take his chances with the grievance process that Sergeant Monroe had the forms printed and the Lieutenant signed

them. They were then submitted via in-house mail.

15. Plaintiff received an envelope on July 18, 2017, from Special Sheriff David H. Tuttle that simply read "not acceptable" [See 'Exhibit 008'] and contained photocopies of the grievances regarding access to his medical records. Plaintiff presumes that this indicates a denial.

16. Seven out of the nine of Plaintiff's grievances were denied on July 27, 2017 [See 'Exhibit 009']; the time allocated for administrative responses to 'emergency grievances' had elapsed at this point. Nevertheless, Plaintiff sent handwritten appeals via in-house mail, that same day. It should be noted that the Internal Grievance Coordinator altered the original grievances when quoting them in his denials. [See 'Exhibit 010']

17. Seven out of the nine of Plaintiff's appeals were denied on August 1, 2017, [See 'Exhibit 011']. Plaintiff has not received an initial or an appellate response to his grievances regarding his dental issue or the issue concerning blankets and warmth.

18. On August 28, 2017, Plaintiff submitted fifteen handwritten grievances that pertain to issues for which he had not known there was legal redress available. In his desire to be relieved of the oppressive policies of the WCJHOC he confronted various correctional officers informally before submitting them via in-house mail. [See 'Exhibit 038']

19. The time frame to respond to the emergency grievances had elapsed on September 1, 2017. Plaintiff sent an appeal to Deputy James Trainor for the grievance packet [See 'Exhibit 039], the same day via in-house mail.

20. The time-frame to respond to an appeal of an emergency grievance had expired on September 11, 2017. Plaintiff has presumed this to be a denial of all grievances he sent in the packet. This exhausts all administrative

remedies available to Plaintiff.

21. Plaintiff did not receive a response to his letters, from **LEWIS G. EVANGELIDIS, CORRECT CARE SOLUTIONS,** or David H. Tuttle, as of September 17, 2017.

22. Plaintiff received a response to his letter from **THOMAS A. TURCO III,** on August 17, 2017. [*See* 'Exhibit 041']

23. Plaintiff received a response to his letter from the Office of the Attorney General, on August 29, 2017. [*See* 'Exhibit 042']

24. Plaintiff received a response to his letter from the Office of the Governor of Massachusetts, on September 1, 2017. [*See* 'Exhibit 043']

25. Plaintiff contends that a lack of timely responses via mail is due to the inhibition of his incoming and outgoing mail by the administration in violation of federal law and retaliation for the filing of grievances as well as the subsequent rise of this action.

### V. STATEMENT OF CLAIM

26. At all relevant times herein, Defendants were "persons" for the purposes of 42USC§1983 who were made aware of the unconstitutional conditions of Plaintiff's pretrial detainment and, nevertheless, refused to execute their duties of inspection, enforcement, maintenance, and care to such a degree as to violate numerous standards established by law and statute; and whilst acting under color of state law, have infringed on Plaintiff's rights by depriving him of various constitutional interests and the basic necessities of life, including: warmth, safety, sanitation, and adequate medical care. This has resulted in profound physical and emotional injury, including incontrovertible risks to Plaintiff's welfare, a possibly life-threatening infection, disfigurement, and significant distress from the overall effects

6

sociable to these conditions, as explained more fully herein.

### VI. FACTS OF UNCONSTITUTIONAL CONDITIONS OF HEALTH AND SAFETY

27. Plaintiff has been housed in the Annex Building since his detainment at the WCJHOC began, with brief periods of temporary reassignment, intermittently, since March 28, 2016.

28. All facts regarding the conditions within the WCJHOC, have been chronically present and continue as of the time of filing.

29. Defendants have failed to enforce, maintain, or inspect for compliance with applicable Codes of Massachusetts Regulations (CMRs) within the WCJHOC, in such a way that places the health, safety, and basic liberties of Plaintiff in substantial danger, violating the Eighth and Fourteenth Amendments to the United States' Constitution, as applicable to Plaintiff as both a pretrial detainee and citizen of these United States.

30. The Annex Building is a housing unit for unconvicted detainees in protective custody, that was built after the effective date of 105CMR451; This building contains a dormitory area that is less than the required habitable space of 105CMR451.322: "Each dormitory in a new facility or a part of a facility constructed after the effective date of 105CMR451.000, should contain a minimum of 60 square feet for each occupant..." [See 'Exhibit 012']

31. At capacity, the Annex Building houses 100 pretrial detainees without further accomodations being necessary. As of June 20, 2017, there are 92 inmates housed in the Annex Building. As of September 7, 2017, there are 91 inmates housed in the Annex Building.

32. The 'dormitory area' of the Annex Building, consists of 50 two-person bunks arranged in close proximity to one another [see 'Exhibit 013'] (at best estimates, about four feet away from each other at all sides not

7

touching another bunk, or wall, or other area accessible only with permission from staff during 'bunk restriction').

33. Even if one considers the common toilet fixture area in summation with the 'bunk area', it still would be insufficient to satisfy the 6,000 square feet mandated by the minimum health and sanitation standards of 105CMR451.322.

34. Furthermore, even if one were to consider the entirety of the Annex Building's 'dormitory area', rather than the actual 'bunk area' itself, all inmates, including Plaintiff, are restricted to the area immediately surrounding their bunk for a majority of the day. Or else they suffer both formal and informal disciplinary action by correctional staff.

35. The 'immediate bunk area' is about 60 square feet per 'neighborhood' of bunks (four of the two-man bunks), at the most liberal approximations, which would violate codes regulating the dimensions of a two-man cell, let alone space that must be shared by the eight inmates restricted to that area. The indifference to health, safety, and sanitation here is needless to say.

36. It should be noted that during bunk restrictions, inmates do not have access to a desk or other writing surfaces, for they are only accessible in the recreation areas during such periods as those that must be shared with showers, visits, religious services, exercise, recreation, telephone usage, dishwashing, seeing the social worker, and using the Lexis Nexis™ terminal. During bunk restrictions, Plaintiff is unable to write a simple letter, let alone to prepare legal papers in a timely manner.

37. Upon arrival to the WCJHOC, Plaintiff, received only two shirts, two pairs of socks, two boxers, two sheets, two towels, two sets of denim uniforms, a reusable plastic cup, a pair of shoes, a disposable hygiene kit, and a soft plastic tote bag with an inmate orientation handbook [*See* 'Exhibit

8

040'].

38. 105CMR451.102 requires that "Each inmate shall be supplied with two clean sheets, a pillow, pillow case, two towels, and a washcloth..." [*See* 'Exhibit 014'].

39. In what appears to be an attempt in cutting expenses, the Worcester County Sheriff's Office (WCSO) has failed to meet the minimum health and sanitation standard concerning the provision of sufficient linens, pillows, and towels to Plaintiff.

40. Upon arrival to the Annex Building on March 28, 2016, Plaintiff received a dilapidated and torn plastic and foam mattress that appeared to be extremely dirty and was no thicker than the width of his fist without being laid upon. All mattresses that he has seen in other units of the WCJHOC are in similar, if not worse, condition.

41. Plaintiff has never, a period far exceeding three months, been given an opportunity to have his mattress cleaned or replaced. There is also no formal or informal policy facilitating such opportunities.

42. The WCSO thusly violates 105CMR451.103 ("Each inmate shall be supplied with a clean and comfortable fire-resistant mattress in good condition... Each mattress pad shall be cleaned every three months, or more often if needed.") [*See* 'Exhibit 015'].

43. During times such as 'bunk restriction's and/or counts, Plaintiff has been reprimanded by several officers and threatened with disciplinary action for being "out-of-place" when utilizing handwash sinks or while already having been in the process of using the toilets. This was not an issue while Plaintiff was housed in a unit were there were cells, which may imply the differential treatment of inmates in protective custody.

9

44. On July 9, 2017, an officer spoke over the intercom of the Annex Building, saying that all inmates had "two minutes to finish up in the toilets" immediately prior to the 1830 count, while Plaintiff was utilizing the latrine. Several instances of similar calls have occurred, the most recent of which was on August 28, 2017.

45. At minimum, this indicates an informal policy violating 105CMR451.112 ("Each inmate and [employee] shall have access to a toilet and handwash sink at all times.") [See 'Exhibit 016'].

46. In the Annex Building, there are showers which have a single actuating button that dispenses scalding hot water. There is absolutely no way for the inmate to control the relative water temperature or to know the temperature of the water prior to having to suffer it.

47. Other units that Plaintiff has been housed in, contain relative temperature control knobs. This may further indicate differential treatment of protective custody inmates due to the sensitive and serious accusations against them.

48. This is incontrovertibly non-compliant with 105CMR451.119 ("Each facility shall have at least one shower or bathtub with hot and cold running water for the first twelve inmates, then one for each additional fifteen inmates.") [See 'Exhibit 017'].

49. In the entire length of his detainment, Plaintiff had never participated in, nor heard of the execution of a fire-safety/emergency evacuation drill, despite actual fires due to recent interior construction done within the Annex Building while inmates were present, including: the open welding of metal walls in the inmate 'bunk area', the use of a gas-powered concerete saw in the inmate 'bunk area', and frequent electrical outlet

10

failures.

50. This practice violates the required safety standard of 103CMR937.02 ("Each county correctional facility shall have a written evacuation plan prepared in the event of a fire or major emergency. This plan shall include, but not be limited to the following:...(d) at least quarterly drills in all locations;...") [*See* 'Exhibit 018']. The very day that Plaintiff received the denial of his grievance concerning this issue, a fire drill was enacted for the first and only time in about one-and-a-half years.

51. On or about July 9, 2017, a Sergeant Adam Sweeney, a regular supervising officer in the Annex Building confiscated an extra blanket from on top of Plaintiff's mattress that Plaintiff had obtained from an inmate returning home, as inmates are not provided with even a single extra blanket despite their requests to correctional officers when indoor temperatures are low from the frequently excessive use of climate control during the nights.

52. Warmth is a basic necessity of life and 105CMR470.102(a) dictates that "Sufficient blankets shall be provided upon request to maintain the warmth of any detainee..." [*See* 'Exhibit 019']. This presents an obvious health risk.

53. During the winter months, the climate is frigid. However the WCSO has made no attempts to ensure the health of inmates as it relates to the suffering of this cold. Plaintiff, spending most of his life in Central California, is not acclimated to such weather. It also further begs the question of differential treatment since inmates in other units are freely given bright orange wool-lined coats for winter recreation, and inmates in the Annex do not have access to any amenity even relative to that.

54. Correctional staff frequently claim that the Prison Rape Elimination Act (PREA) requires all inmates to suffer, in the Annex Building, to wear a

full-uniform at all times, even during outdoor recreation in the hot and humid summer months. The WCSO uniform being a double layer of denim and cotton, it is unreasonable to force Plaintiff to wear a full-uniform in such a clime with total disregard for his health and safety. The policy actually discourages individuals from engaging in outdoor recreation, especially when indoor climate controls fail in the Annex Building.

55. This violates 105CMR451.210 ("Each inmate shall be furnished with proper clothing to preserve health and comfort at all times of year, [if his wardrobe is not permitted], or not adequate for these purposes.") [*See* 'Exhibit 020'].

56. Food temperatures and the content of food trays, since they are prepared and filled by inmates in the main WCJHOC complex's general population, are very frequently, cold to the point of being inedible or frozen and contain human bodily substances (what appears to be saliva, mucuos, urine, feces, hair, and/or semen). There is no adequate screening process for food in the preparation facility, nor are the complaints to staff about the food ever taken under investigation and, often, the staff will refuse an inmate's request for a new tray. This is attributable to the fact that the Annex Building houses only detainees with high-profile cases, sex-related charges, gang-related issues, or are testifying in court against another inmate and are, therefore, in protective custody.

57. During major cleanings of the Annex Building, which occur weekly, officers have instructed working inmates to douse the air-intake filters of the Heating, Ventilation, and Cooling (HVAC) system with a water hose, without removing the filters from the ducts. Such an action renders the filters ineffective and allows communicable pathogens to proliferate through the air much quicker and with more efficacy. The filter has only been changed once

during the entire length of Plaintiff's detainment.

58. Adam Walker, an inmate in the Annex Building, was tested for Tuberculosis (TB) using a subcutaneous purified protein test. The medical staff viewed the positive test result and the WCJHOC correctional and medical staff left him in the Annex Building, without any quarantine or separation from the other inmates in the building. Four to five days later, he was taken through an X-Ray of his lungs, in the Annex, to test as to whether or not the infection was active or latent. The entire time in-between, Adam Walker, were the infection active, could have transmitted this airbourne life-threatening disease to every inmate in the open dormitory.

59. These obscene conditions objectively constitute punishment that is cruel and unusual (violating the Eighth Amendment) and are being imposed upon citizens who are solely detained for the purposes of being present in the court which they are charged and are thusly unconvicted of any crime (violating the Fourteenth Amendment).

60. Multiple affiant-witnesses have provided affidavits in support of the facts contained herein through statement of their experiences under the same status, in the same facility, and at the same times as Plaintiff [*See* 'Exhibit 021' through 'Exhibit 027']. The WCSO, however, did not make a notary public available to authenticate these documents, as will be more fully explained herein.

## VII. FACTS OF UNCONSTITUTIONAL DEPRIVATIONS OF CERTAIN RIGHTS AND PROTECTIONS

61. In the WCJHOC, the disciplinary segregation (DL) unit and administrative segregation (ADM) unit is the same unit: "A-2".

62. Multiple inmates, including Plaintiff, have been forcibly, or with the threat of force, handcuffed, caged, and then transported to A-2 for

disciplinary actions unrelated to any physical altercations, threats of physical violence, or even verbal refusal to transfer to another housing unit. At these select times that Plaintiff was transferred to A-2, he was completely unaware of the reasons why he was placed in A-2, until he finally received a disciplinary hearing a number of days later by an officer.

63. Plaintiff describes the conditions of A-2 as being as follows:

A) All inmates are housed in small double-bunked cells that may or may not contain a desk or writing area;

B) All cells are camera monitored on the top tier and unmonitored on the bottom tier;

C) Cells are disgusting, often with feces and urine covering a majority of the inhabited space;

D) There are absolutely no working climate control measures utilized in the summers, to the point where the oppressive humidity would deprive him of sleep at night;

E) Every fifteen minutes, at night, officers shine a bright LED flashlight in the eyes of Plaintiff to keep him awake;

F) 'OC' (a chemical spray in aerosolized form that is used as a chemical weapon and detterent in street riots and is sociable, in effect, to a highly-concentrated pepper spray) is implimented to force the compliance of inmates in A-2 by spraying it briefly into the air inside of their cells. The chemical is so potent that it quickly and unyieldingly spreads through the ventilation into the open tier, to every other inmate's cell in the housing unit. Meanwhile, correctional officers close doors leading out of the unit and wear full-face gas-masks, to protect themselves from the debilitating effects of the spray;

G) Some inmates of A-2 are frequently deprived of food, due to various conspiracies entertained by various inmates and guards alike. The reasons for such conspiracies, as Plaintiff has witnessed them, are usually due to the charges against the subject inmate, a common factor of discrimination within the WCJHOC.

H) Inmates are allowed to shower only three times every seven days, and they have an hour to do so;

I) If an inmate wishes to exercise, use the phone (only for inmates on ADM status), retrieve a book at random, cut his hair using the shared set of clippers, or use the LexisNexis™ terminal, he must do so in place of his opportunity to shower;

J) All books, magazines, periodicals, publications, newspapers, or any mailed material outside of personal letters handwritten in blue or black ink, on a white envelope, without any stickers/labels, and written on white lined-paper only, are prohibited regardless of your housing status in A-2;

K) All hygiene items, such as commissary purchased or state-issued medications, deodorants, lotions, hair conditioners, toothpastes/toothbrushes, napkins, or safety razors are prohibited regardless of your housing status in A-2;

L) Absolutely no items purchased on commissary outside of stationery, are permitted in A-2, regardless of housing status.

M) Officers have adhered to a custom of turning off water or electric toilet controls to certain cells for no reason other than their amusement, have allowed other inmates to spit in food trays intended for another particular inmate, have moved inmates to cells on the lower tier so that they could be fought by other inmates without cameras monitoring their

activities; and

N) Some inmates are moved from cell to cell, and from suicide watch/mental health segregation (A-1), where conditions are even more deplorable, to A-2 and then back again, all within a few hours in the middle of the night in order to prevent them from sleeping.

64. Plaintiff was held for days beyond the end-date of his sanctions for discipline, on multiple occasions. He was never told why, by any officer or administrator, neither formally nor informally, despite numerous requests to officers in charge of A-2, such as Lieutenant Seamus O'Day or Lieutenant Mara. Plaintiff was never made aware of, or given any indication of a change in housing status in A-2 or that an ADM hearing ever occurred. He simply watched the days go by with great distress and confusion as to whether or not he would ever leave what had appeared to be some archaic form of torture. Especially when his discipline regarded the non-violent act of reporting an officer to the Special Services Division for threatening his life.

65. Plaintiff reasonably believes that the facility simply placed him on ADM status, without hearing or notification, as a means to hold him in A-2 beyond the policies that limit disciplinary lock-in times as punishment for facility rule infractions, in violation of his rights to due process.

66. Facility policy has formally stated that "All intentional acts of sexually abusive behavior or intimacy between an inmate and a Sheriff's Office employee, contractor or volunteer, or between an inmate and another inmate, regardless of consensual status, are prohibited and the perpetrator shall be subject to administrative, criminal, and/or disciplinary sanction," [See 'Exhibit 040', page 17]

67. The right of Plaintiff to engage in 'intimacy' with another inmate, an act which might not include sexual activity, is a natural right that, under

16

his unconvicted status as a pretrial detainee, he is unjustly deprived of without due process of law. Especially considering that sexual activity, let alone mere intimacy, does not present a risk to jail security or his attendance at court.

68. Plaintiff's right to engage in consensual sexual activity with another pretrial detainee is also protected by the constitution and any facility policy or statute depriving such a right violates the Fourteenth Amendment. Consensual sex is not sexual abuse, no matter how much a facility or state actor wishes for it to be so.

69. Whenever Plaintiff has to appear in court, he is searched by pat-down upon departure from the Annex Building to the main WCJHOC complex. Then, he is put through a detector prior to being placed in a van for transportation to the court itself. He is then patted-down upon arrival to court. Plaintiff is pat-searched again when being picked-up from court and then placed into a van. Then, upon his arrival back to the WCJHOC, he is stripped completely and cavity-searched in the mouth and anorectal areas, and then placed through an X-ray body scanner while partially clothed before returning back to the Annex Building. Such a search procedure is needlessly excessive and violates Plaintiff's rights to reasonable expectations of privacy and, needless to say, puts him in an extremely uncomfortable position that is demeaning and subhuman, every time he must appear in court (on average, every 30 days).

70. At no point in time is Plaintiff unmonitored or outside of the constant supervision of a correctional or court officer in between searches, and every facility that he is paraded through is secure and reasonably restricted from access by the general public. No reasonable belief exists that Plaintiff was introduced to or could have been in possession of contraband. This is moreso unlikely every single time he has been transported to court, since he has never been found with contraband in the entirety of his year-and-

17

a-half detainment.

71. The WCSO employs the services of a private telecommunications service, Securus Technologies, that allows employees to monitor and record private telephone conversations, even those of pretrial detainees. They force the friends and family of Plaintiff to have their personal conversations wiretapped, siezed, and reviewed at the leisure of a governmental entity, without choice of consent, while there is no legitimate governmental interest to be served. Such a communication has a reasonable expectation of privacy that should not be subjected to the blanketed power of the WCSO to wiretap and record the phone calls paid for by a detainee or his loved ones, under such a policy.

72. The WCJHOC has charged Plaintiff just over $67, allegedly as a deposit for used jail-issued clothings, linens, and a tote-bag. This deposit is required and automatically deducted from any funds received by any inmate within the facility. It must be paid before any funds may be used for commissary purchases such as personal hygiene products or stamps and paper for sending letters.

73. Plaintiff does not receive any interest, nor is he given any notice as to how any interest is utilized by the facility, although the money is his property.

74. All articles of clothing and linen in the plastic tote-bag, which the WCSO strangely refers to as a "footlocker", that were issued to Plaintiff were in an obviously used condition and in a state of objective deterioration from previous use.

75. This deposit appears to be used as a means to abuse the position of the WCSO over inmate finances and create a rather massive source of untaxed

revenue.

76. Commissary products sold within the Keefe Commissary Network is priced similarly throughout all facilities Plaintiff has seen the pricing-lists of, except for the WCJHOC. The WCSO has somehow significantly increased the prices of some of the exact same items on these lists to double, if not triple, the prices of those items within other facilities on the same commissary network. Such a thing raises the reasonable suspicion that profits or monetary gains are the primary motivation in the detainment of Plaintiff using such unconstitutional methods, which represents a substantial departure from other facilities within the Commonwealth, that serve the same governmental purposes.

## VIII. FACTS OF UNCONSTITUTIONAL DENIAL OF ACCESS TO ADEQUATE MEDICAL CARE

77. Upon arrival to the WCJHOC, Plaintiff was given an initial medical screening by one of the nurses contracted with **CORRECT CARE SOLUTIONS**, prior to being placed in any housing assignment despite Plaintiff's inidication in the screening of tooth pain pertinent to the formation of a cavity, Plaintiff was never given a full physical examination (until exactly one whole year later) or referred to the dentist.

78. The lack of a comprehensive physical assessment presents a gross indifference to Plaintiff's health and violates 103CMR932.07(1) ("Pursuant to M.G.L.c.127, §16, each inmate committed to the facility for 30 days or more shall receive a thorough physical examination. Said examination shall take place no later than seven days after admission...") [*See* 'Exhibit 030'].

79. On June 22, 2017, Plaintiff completed a Healthcare Request form for **CORRECT CARE SOLUTIONS** to allow him to personally inspect his medical records. The next day, an individual with the initials 'Bt' had indicated that he was unable to personally inspect his medical records and that a Release of

19

Information was necessary so that it may be inspected by someone other than Plaintiff once it is placed in his property in a disk format, which is inaccessible to Plaintiff during his detainment [*See* 'Exhibit 031'].

80. This presents a serious issue that places not only Plaintiff's health at risk but also his privacy and the knowledge of his own care. Such policies violate 105CMR205.505 ("Medical records may be inspected by the inmate to whom they relate, by his/her attorney or by any other person upon written authorization of the inmate... Copies of such records shall be furnished within 72 hours of request...") [*See* 'Exhibit 032'].

81. On or about June 14, 2017, an inmate by the name of Victor Rios, presented a complaint to the nursing staff of **CORRECT CARE SOLUTIONS** during medication pass, as well as to multiple WCSO correctional officers, including a Captain Foley, that he was experiencing chest pain. At or about 0600 the next day, Mr. Rios had a cardiac emergency in which he had stopped breathing, had no pulse, and was unresponsive to both vocal and painful stimuli.

82. Correctional officers Sergeant Briscoe, Lieutenant Crandall, Officer Fortin, Officer Hill, Officer Lynch, Officer Culley, Officer Feliz, Officer Bissel, and Sergeant Romano, were all present at one point or another throughout the incident.

83. Officer Fortin was the first individual to Mr. Rios' bunk as he began experiencing what appeared to be a tonic-clonic seizure. Mr. Rios then went still, with sonorous breathing in strokes universally indicative of cardiopulmonary dysfunction, and she waited approximately five minutes before instructing another officer to contact the medical department. By then Mr. Rios had stopped breathing completely.

84. Within ten minutes, more correctional officers had arrived and,

during this time, no one had initiated Cardiopulmonary Resuscitation (CPR).

85. Plaintiff, who is trained in CPR as well as the United States' Army's Combat Lifesaving Program, and another inmate who is an inactive Massachusetts' and National Registry of Emergency Medical Technicians' licensed Paramedic (NREMT-P: The highest level of rank, skill, and competence in prehospital medical care; scope of practice includes, but is not limited to, electrocardiograph interpretation, advanced pharmacology, and the field preformance of invasive surgical procedures), and an active holder of an Advanced CPR for Healthcare Providers and an Advanced Cardiac Life Support certifications, had attempted to provide life-saving maneuvers (including CPR) to Mr. Rios, however they were told by Officer Fortin, "Shut the fuck up and stay back, or else you're getting lugged [to the Hole]".

86. Approximately ten minutes had passed with Mr. Rios' lack of spontaneous breathing and the lack of rescusitative efforts being attempted by correctional staff. The odds of successfully resuscitating a patient, out-of-hospital after 10 minutes without CPR or basic life-support, are morbidly low due to anoxic brain tissue damage and total organ failure due to asphixiation at the cellular level. If Plaintiff or the inmate/healthcare provider, was allowed to provide, at minimum, basic life-support to Victor Rios immediately as such maneuvers were indicated, then Mr. Rios' chances of survival would have increased to beyond likely.

87. Unfortunately, Victor Rios died after being placed on mechanical life-support in a 'vegetative state' due to permanent brain damage probably resultant from the inadequate response by facility staff and the medical incompetence of the nurse who arrived on scene moments later.

88. A nurse from **CORRECT CARE SOLUTIONS** arrived in the Annex Building to respond to Mr. Rios' cardiac emergency before the emergency services had

21

arrived. The nurse had initiated what appeared to be CPR, however, was far outside the standards of the current guidelines and highlights (2015) of the American Heart Association's CPR certification, which is required of all HCPs (or its equivalent) in Massachusetts. Plaintiff witnessed the nurse completing various numbers of chest compressions (between seven and sixteen) before instructing a correctional officer to administer mouth-to-mouth ventilations, when standards prescribe 30 compressions at a rate of 100 per minute and two ventilations after each cycle of compressions, for adults.

89. The inmate/HCP was Adam Walker, whose affidavit and expert declaration are attached [*See* Exhibits '044' & '021'].

90. The nurse had obtained a bag-valve mask (BVM) and an Automated External Defibrillator (AED), that was all readily accessible to correctional staff in the Annex Building, and yet waited even longer until all other inmates were moved to the other end of the Annex Building before applying its two leads and powering on the machine. Just another example of either a lack of CPR training or the incompetence of both nurses and correctional staff within the WCJHOC.

91. This incident exemplifies the presence of a substantial risk to Plaintiff's life, health, and safety in the event of a medical emergency. **CORRECT CARE SOLUTIONS** and the WCSO have inhibited Plaintiff's access to adequate medical care by providing poorly trained and/or untrained staff, who have proven themselves to be inefficacious in emergency situations to such a degree so as to become directly culpable for the death of an inmate. Inmates who are provably more competent and well-trained are denied the opportunity to save the life of another human being.

92. The entire incident of Mr. Rios' emergency and consequential death, challenged Plaintiff in whether or not the provision of life-support despite

the unfair consequences of extreme disciplinary action was the right thing to do. Mr. Rios' decedence and the staff's ultimatum that prevented Plaintiff from saving his life, has caused immense emotional distress and mental trauma due to the challenges of moral relativism present in this case.

93. The lack of proper training amongst WCJHOC staff violates 103CMR932.05(1) ("Written policy and procedure shall provide for the training of other personell to respond to health-related situations. This shall include the establishment of a training program by a responsible health authority in cooperation with the facility administration, which includes instruction in the following areas: (a) the ability to respond to health-related situations within four minutes; (b) recognition of signs and symptoms, and knowledge of action required in potential emergency healthcare; (c) administration of first-aid and [CPR] (to be documented by a copy of the current certification placed in individual training records); (d) methods of obtaining assistance; (e) recognition of signs and symptoms of mental illness, retardation, emotional disturbance and chemical dependency; (f) procedures for inmate transfer to appropriate medical facilities or healthcare providers.")[*See* 'Exhibit 033'].

94. By not providing adequate medical to Plaintiff, through a failure to inspect or correct the adherence to standards meant to ensure the basic necessities of life, a problem that plagues the WCJHOC, Defendants have violated his rights protected by the Eighth and Fourteenth Amendments.

95. As of July 5, 2017, Plaintiff has a total loss of dental tissue due to an infection created and amplified by an untreated cavity that he indicated upon his initial medical screening. He has experienced severe pain and ultimate deformity as a result of this infection.

96. Plaintiff has been held for over a year without any dental

23

interventions or antibiotic treatments. Plaintiff contends that this is due to his housing assignment in protective custody.

97. Swelling of the gums, bleeding, and even the inability to chew was expressed repeatedly, yet all healthcare requests, both formal and informal, went unresolved, until September 7, 2017, after the initial filing of this action.

98. Plaintiff had experienced a stiffness of the neck and an inability to fully extend his knees, signs and symptoms indicative of the dental infection spreading to the meninges or other neurological tissues. The infection, in this case, was quite possibly life-threatening, however this does not spur **CORRECT CARE SOLUTIONS** into action, despite objective signs of infection, such as fever and vital signs indicative of increased vessel permeability.

99. Total loss of tooth has forced placed Plaintiff into permanent deformity of the mouth.

100. During informal expressions of his dental issue, Plaintiff was told by both medical staff and correctional officers that the only treatment of cavities, within the facility, was extraction, resuling in the unnecessary destruction of living tissue that could easily be saved by the simple filling and capping of the tooth.

101. Plaintiff contends that it is cost that is the primary motivation for providing inadequate medical treatment.

102. Plaintiff refused dental extraction of the afflicted tissues on or about August 17, 2017. The severity and frequency of episodes of fatigue and delirium increased to the point that Plaintiff retracted the refusal and a dentist preformed the extraction on September 7, 2017, and Plaintiff was

24

prescribed Ibuprofen for pain management.

103. These dental policies violate 103CMR932.12 ("Written policy shall require the provision of dental care, under the direction of a dentist licensed in the Commonwealth, to all inmates incarcerated for 30 days or more as follows: (1) Dental treatment, not limited to extractions, when the health of the inmate might be adversely affected;...")[*See* 'Exhibit 034'].

104. The WCSO and **CORRECT CARE SOLUTIONS** policies and procedures regarding access to medical care, considerably inhibit and adversely affect the health of Plaintiff and other inmates. 103CMR932.8 requires that "[w]ritten policy and procedure shall provide for unimpeded access to healthcare..." [*See* 'Exhibit 035'], however policy dictates that inmates cannot attend 'sick-call' without first indicating injury and/or illness on a Healthcare Request form and then wait for the HCP conducting 'sick-call' to call upon the subject inmate's name before they can receive any medical care of any sort. If Plaintiff attends 'sick-call' without a form placed in the designated recptacle, a day prior, then he is promptly turned away.

105. This does not allow for inmates to present for urgent or emergent complaints to medical staff. Victor Rios was turned away for this reason according to a nurse 'Michael', an agent of **CORRECT CARE SOLUTIONS**.

106. Plaintiff has never been provided with the opportunity for nor ever given knowledge of the availability of special medical programs required by the Commonwealth of Massachusetts to ensure adequate access to medical care in correctional facilities. Specifically, a flu shot and immunization program.

107. 103CMR932.10(2) indicates that "Written policy and procedure shall provide, at minimum, the following medical programs;...(d) medical preventative maintenance including health education and medical services provided to take advance measures against disease, such as inoculations and

immunizations;..." [See 'Exhibit 036'].

108. Plaintiff seeks relief for damages due to permanent deformity resultant from loss of tooth, life-threatening risks to health resulting from medical negligence and the deliberate indifference of Defendants, loss of wages resultant from plausible future ailments sociable to the inadequate care received during his detainment, the debilitating and wanton pain of the severe infection, compensation for the time spent under such unconstitutional conditions of confinement and their cruel and unusual dangers, emotional damages, future medical fees for dental replacement, and other such damages afforded to him under law and precedence.

## IX. FACTS OF UNCONSTITUTIONAL DENIAL OF ACCESS TO THE COURTS

109. In attempting to access the electronic law library (which is the method decided by the institution to facilitate access to the courts by providing a means to research laws, rules, and opinions in lieu of providing free lawyers or paraprofessionals to prepare legal papers with some modicum of proficiency), so that he may find information as to the elements of allegations against him and to research how he may challenge the conditions of his confinement, Plaintiff was denied access by multiple correctional officers, especially a Sergeant Ovian, on or about February 21, 2017. Roughly three days later he received a single hour of access.

110. Don Siergie, the Director of Inmate Services, indicated to Plaintiff that he must submit another written request to receive another hour of access to the electronic law library.

111. The electronic law library is a LexisNexis™ terminal (by Matthew Bender & Company) on a Lenovo^R personal computer without any plausible access to the internet and is locked inside of the 'social worker's office and is only moved twice out of the day, between 0900 to 1045 and 1230 to 1430, for

26

use by inmates selected by the social worker to be utilized (for one to two hours at a time), about three days a week.

112. Being that there are 100 inmates in the Annex Building, at capacity, this single computer with all the restrictions imposed upon access to it has considerably inhibited access to the courts for Plaintiff and other inmates in the sense that it may prevent the timely adherence to certain rules of civil procedure and definitely does not give Plaintiff enough time to become legally proficient enough to render efficacious *pro se* litigation against the conditions of his confinement, or petition the courts for a redress of grievances (in violation of the First Amendment).

113. Plaintiff was denied access to photocopies on July 13, 2017, by a Dean Cavaretta, an inmate services counselor, who was instructed by his superior, Don Siergie, to do so. This is further inhibition of access to the courts and probable retaliation against Plaintiff for exercising his right to grieve the conditions of his confinement.

114. There are no typewriters or word-processors available in the Annex Building, hence why Plaintiff is forced to request the free aid of an outside typist to print this action and other supporting papers.

115. On June 30, 2017, Plaintiff requested access to the law library to research issues relative to his defense in the Worcester County Superior Court, however, Plaintiff did not receive access until July 7, 2017, for an hour. Plaintiff contends that this delay is due to the filing of grievances since such a delay is a common mode of retaliation by facility staff.

116. On August 29, 2017, at or around 0910 Dean Cavaretta refused to retrieve an ink cartridge for the LexisNexis™ terminal's printer, preventing Plaintiff and other inmates from being able to print legal resources. When asked why, Mr. Cavaretta indicated that "Too much printing is going on" and

"With lawsuits being filed, what do you expect?" This statement provides the casual connection necessary to establish this particular claim of retaliation.

117. The inhibition of legal access violates 103CMR934.01(4) ("Written policy and procedure shall include a program designed to assist inmates in the preparation and filing of legal papers. Such a program shall meet the minimum requirements for legal assistance programs required by [Law]. The program shall consist of one of the following: (a) a law collection containing legal materials as required by [Law], and required equipment and supplies to prepare legal papers...") [*See* 'Exhibit 028'].

118. Denial of access to free photocopies is one of the many violations of 103CMR478.11 [*See* 'Exhibit 029'].

119. On August 1, 2017, at about 0945, Plaintiff was called into the 'social worker's office and spoke to Don Siergie in the presence of Sergeant George Monroe (in a manner that placed him in a position of severe anxiety due to the threatening nature of the encounter). Siergie called Superintendent David H. Tuttle on the telephone and they both informed Plaintiff that the WCSO is going to refuse to provide a notary public to him or anyone known to be assisting him in his suit against the facility, under the advisement of Special Assistant Attorney General Andrew Abdella, the General Counsel for the WCSO.

120. Plaintiff lacks access to any writing surfaces during 'bunk restriction' in the Annex Building's open dormitory, which occur for a majority of the day.

## X. FACTS OF RETALIATION

121. Plaintiff has experienced retaliation not only for the filing of a total of 25 grievances, all relevant to this case, but also for the subsequent

rise of this action. This is a violation of Plaintiff's First Amendment protection to petition the government for a redress of grievances, and his First and Fourteenth Amendment protections of access to the courts.

122. Sergeant George Monroe has told Plaintiff that because he has "stirred up the shit pot, with all of [his] grievances," he was removed from the list for an inmate worker position for as long as he is detained.

123. All letters that Plaintiff has sent to officials such as the Commissioner of Corrections, the Attorney General, and the Governor, have been inhibited unreasonably, as the differences in their dates, paired with the officials' responses, indicate.

124. The envelope on which the Commissioner of Corrections' letter is attached, indicates a date on its reverse that is far beyond that of the postmark on the front of the envelope, and a gap between the date received by the WCJHOC and the date received by Plaintiff, indicated in the 'Exhaustion of Administrative Remedies'. All of the letters have dissimilar and unreasonable expanses in time between the date sent by respective senders and the dates that these letters were actually received by Plaintiff.

125. Plaintiff attempted seven different times to get his action filed via Certified Mail™ to this Court. Initially in June of 2017, he requested Certified Mail™ paperwork from Dean Cavaretta. Mr. Cavaretta stated that they were available in the officers' booth. Plaintiff asked Unofficial Supervising Officer (USO), at the time, Officer Culley, about the forms. Officer Culley stated that the Social Worker was the only one who would have access to something like that. Plaintiff then waited over the weekend until Mr. Cavaretta returned the following Monday. He asked Mr. Cavaretta again, that Monday, to which he replied that Officer Culley was wrong and that he didn't have access to those forms; instead he gave Plaintiff an inmate funds transfer

form. Plaintiff asked Sergeant George Monroe, who indicated that he doesn't have "anything like that" in the booth.

126. Plaintiff, realizing that persistence was futile with the immediate staff around him, wrote a letter to the mailroom. After a week of no response, he sent another. Plaintiff never received a response.

127. On July 23, 2017, Plaintiff received a Untied States Postal Service Certified Mail™ form from another inmate. If it was not for this, it would have never been obtained. He placed the mailpiece in the proper pick-up area, the same day.

128. The mailpiece containing this suit was returned that Saturday, the last mailing day of the week, stating that the Plaintiff needed to pay postage, which is strange since the signed inmate funds transfer was attached to the mailpiece with more than enough authorized for postage.

129. Mr. Cavaretta personally took the mailpiece down to the mailroom on that Monday. He then brought it back to Plaintiff with no discernible reason as to why it was being returned yet again.

130. Mr. Cavaretta took the mailpiece again and a week passed without Plaintiff receiving any sort of receipt for the Certified Mail™ postage.

131. Plaintiff contacted his criminal attorney and mother, who then contacted the facility mailroom about the mailpiece and an unnamed individual stated that the mailpiece did not exist.

132. It was not until Plaintiff's criminal attorney conference-called the mailroom supervisor 'Michael', was the mailpiece then "found" and then sent the next day. Plaintiff received receipts that same day. [*See* 'Exhibit 045']

133. Plaintiff has had books sent directly from the publisher denied under the false premise that they were "used", and all the attempts to provide proof that they were not "used" were ignored. This has only occurred since grievances relative to this action were filed as Plaintiff has never had an issue with his books from this vendor prior to the exercise of his right to file grievances. [*See* 'Exhibit 046']

134. Plaintiff has also ordered a *Black's Law Dictionary*, new, from a publishing company via Amazon, Inc. per facility policy. It was nevertheless denied [*See* 'Exhibit 047'].

135. Plaintiff ordered another, different edition, of *Black's Law Dictionary* from a different publisher/vendor. It was denied [*See* 'Exhibit 048'].

136. Plaintiff ordered yet another *Black's Law Dictionary* from another vendor/publisher. It was still denied [*See* 'Exhibit 049'].

137. It is reasonable to presume, at this point, that the WCSO employees in the mailroom of the WCJHOC are denying Plaintiff's books despite compliance with facility regulations in a subtle campaign of harrassment directed at Plaintiff for the exercise of his rights to grieve and petition.

138. Plaintiff contacted Internal Affairs Investigator Steve Scanlin via In-House mail on August 23, 2017, regarding this issue [*See* 'Exhibit 050'].

139. Plaintiff attempted to mail grievances on September 1, 2017, however the envelope that contained them was tampered with and then stuffed in the mail receptacle after the mailroom staff had picked up all of the outgoing mail. Thusly, it was prevented from being retrieved. Plaintiff brought this to the Sergeant's attention and wrote another letter to Internal Affairs detailing the incident with times for camera footage review of the area [*See*

'Exhibit 051'].

140. As of September 17, 2017, Plaintiff has yet to receive a response to these letters.

## XI. CAUSES OF ACTION

141. Plaintiff realleges and incorporates paragraphs 1-140.

### DELIBERATE INDIFFERENCE TO INMATE HEALTH AND SAFETY

142. In violation of the rights of Plaintiff guaranteed by the Eighth and Fourteenth Amendments to the United States' Constitution, Defendants **EVANGELIDIS** and **TURCO,** and their agents, employees, and all persons acting in concert or participation with them, by failing to inspect, maintain, enforce, or correct formal and informal WCJHOC policies and customs to the standards established by law to provide constitutional modes of detainment, have thusly offended as follows:

### COUNT I

143. Forcing Plaintiff to live in a small space, even within an open dormitory, or else receive disciplinary action despite the minimum health and sanitation code 105CMR451.322. (¶¶ 34-36)

### COUNT II

144. Failing to provide Plaintiff with clean and proper linens and towels, which are necessary according to the minimum standard of 105CMR451.102, in what appears to be an attempt at saving money. (¶¶ 37-39)

### COUNT III

145. Neglecting to provide Plaintiff with clean mattresses, in good condition, throughout his detainment, despite the health requirements of

32

105CMR451.103, nor enforce any policy that would facilitate full-compliance with this standard. (¶¶ 40-42)

## COUNT IV

146. Permitting, at minimum, an informal policy that prevents Plaintiff from utilizing toilets or handwash sinks at certain times, in complete disregard of the state health code 105CMR451.112 (¶¶ 43-45).

## COUNT V

147. Disregarding the fact that Plaintiff has to suffer scalding water during showers due to the lack of both water temperature controls and access to cold water in the facility showers, in violation of the standards pursuant to 105CMR451.119 (¶¶ 46-48).

## COUNT VI

148. Placing Plaintiff's life in jeopardy by refusing to implement a single fire/emergency evacuation drill in almost one-and-a-half years, despite actual fires in the building and the safety code 103CMR937.02 (¶¶ 49-50).

## COUNT VII

149. Facilitating the deprivation of warmth, a basic necessity of life, from Plaintiff by violating 105CMR470.10(a) (¶¶ 51-53).

## COUNT VIII

150. Risking Plaintiff's health to a severe degree, by forcing him to wear a full uniform of two layers of denim and cotton whilst exercising outdoors in the hot and humid summers, without regard to 105CMR451.210 (¶¶ 53-55).

## COUNT IX

151. Recklessly permitting general population inmates to prepare food for protective custody inmates, where they frequently place bodily substances within the food or fail to heat it to consumable temperatures (¶ 56).

## COUNT X

152. Increasing the risk of disease transmission by instructing inmates to douse ventilation ducts with water while the filters are installed (¶ 57).

## COUNT XI

153. Encouraging the spread of tuberculosis by allowing an inmate who tested positive for the disease to remain in the open dormitory of the Annex Building for a whole week until an X-Ray was preformed (¶ 58).

*DEPRIVATION OF UNCONVICTED CITIZENS' RIGHTS TO DUE PROCESS AND COMMUNICATION*

154. In violation of the rights of Plaintiff guaranteed by the First and Fourteenth Amendments to the United States' Constitution, Defendants **EVANGELIDIS** and **TURCO,** and their agents, employees, and all persons acting in concert or participation with them, by failing to inspect, maintain, enforce, or correct formal and informal WCJHOC policies and customs to the standards established by law to provide constitutional modes of detainment, have thusly offended as follows:

## COUNT I

155. Forcing Plaintiff into disciplinary segregation without hearing, disposition, and sanctions prior to transportation to "A-2", a unit of deplorable conditions, even when the offenses alleged against WCJHOC rules are non-violent infractions that present no security risk (¶¶ 61-63).

### COUNT II

156. Holding Plaintiff in "the Hole", despite his sanctions having ended, without giving any formal or informal indications that he was then on administrative segregation status, without hearing or opportunity to present valid arguments against housing in such deplorable conditions (¶¶ 63-65).

### COUNT III

157. Not allowing Plaintiff to receive any reading materials by mail or purchase personal hygiene products while in administrative segregation and not under disciplinary sanctions for the entirety of his detainment in that unit (¶ 63).

### COUNT IV

158. Depriving Plaintiff of his right to have intimate and consensual relationships with another pretrial detainee, despite both parties' being unconvicted of any crime and the policy's lack of any legitimate governmental interest in prohibiting even the slightest intimate action amongst detainees (¶¶ 66-68).

*VIOLATION OF REASONABLE EXPECTATIONS OF PRIVACY*

159. In violation of the rights of Plaintiff guaranteed by the Fourth and Fourteenth Amendments to the United States' Constitution, Defendants **EVANGELIDIS** and **TURCO,** and their agents, employees, and all persons acting in concert or participation with them, by failing to inspect, maintain, enforce, or correct formal and informal WCJHOC policies and customs to the standards established by law to provide constitutional modes of detainment, have thusly offended as follows:

### COUNT I

160. Excessively searching Plaintiff and other inmates every single time they attend court, (on average, monthly) by forcing him to do degrading things such as expose bodily cavities to various officers before being redundantly placed in an X-Ray body scanner, when no reasonable suspicion exists that Plaintiff has obtained contraband despite being under the constant supervision of correctional and court officers and despite several "pat-down" searches in between transports (¶¶ 69 & 70).

COUNT II

161. Unlawfully employing individuals to wiretap, monitor, and record the phone calls of Plaintiff and his loved ones, although he is an unconvicted pretrial detainee, and giving access to said recordings of all conversations to any local, state, or federal prosecutor as well as using the recordings to enforce WCJHOC rules or policies, despite the fact that Plaintiff and family members are the ones who pay for these phone calls (¶ 71).

*EMBEZZLELING OF MONEY FROM INMATE ACCOUNTS*

162. In violation of the rights of Plaintiff guaranteed by the Fifth and Fourteenth Amendments to the United States' Constitution, Defendants **EVANGELIDIS** and **TURCO**, and their agents, employees, and all persons acting in concert or participation with them, by failing to inspect, maintain, enforce, or correct formal and informal WCJHOC policies and customs to the standards established by law to provide constitutional modes of detainment, have thusly offended as follows:

COUNT I

163. Seizing, for use as public funds, about $67 from Plaintiff's inmate accounts for the provision of used clothing, linens, and uniforms, and then preventing Plaintiff from ordering personal hygiene products, stamps, or

36

stationery, until such a deposit in that amount is made (¶¶ 72, 74, & 75).

## COUNT II

164. After seizing $67 as a deposit from Plaintiff's account, refusing to pay Plaintiff interest for the year and a half that he has been detained, and seizing said interest for what one can only presume to be public purposes (¶ 73).

## COUNT III

165. Overpricing commissary items, and phone calls, as a means to abuse the position of the WCSO over inmate finances rather than utilizing the prices common to other facilities that are on the same commissary network, by doubling or tripling the amounts (¶ 76).

### *INHIBITION OF ACCESS TO ADEQUATE MEDICAL CARE*

166. In violation of the rights of Plaintiff guaranteed by the Eighth and Fourteenth Amendments to the United States' Constitution, all Defendants, and their agents, employees, and all persons acting in concert or participation with them, by failing to inspect, maintain, enforce, or correct formal and informal WCJHOC policies and customs to the standards established by law to provide constitutional modes of detainment, have thusly offended as follows:

## COUNT I

167. Disregarding the regulation of 103CMR932.07, by failing to provide Plaintiff with a thorough physical assessment upon arrival or refer his medical issues to the proper specialist (¶¶ 77 & 78).

## COUNT II

168. Violating Plaintiff's right to personally inspect his own medical records, pursuant to 105CMR205.505 (¶¶ 79 & 80).

### COUNT III

169. Improperly training staff to respond to emergent medical situations in violation of 103CMR932.05(1) (¶¶ 81-93).

### COUNT IV

170. Ignoring Plaintiff's complaint of dental abcess and its corresponding pain and swelling to such an extent as to result in the total loss of living dental tissue and forcing Plaintiff to submit to dental extraction (¶¶ 94-103).

### COUNT V

171. Providing only dental extraction despite 103CMR932.12 (¶¶ 100 & 102).

### COUNT VI

172. Implementing an inadequate and inefficient means of handling inmate health complaints to such a degree as to result in the death of an inmate (¶¶ 81, 104, & 105).

### COUNT VII

173. Lacking any special programs, in the WCJHOC, for advanced measures against disease, such as a flu shot or immunization program (¶¶ 106 & 107), despite 103CMR932.10(2).

### GROSS DENIAL OF ACCESS TO THE COURTS

174. In violation of the rights of Plaintiff guaranteed by the First and

Fourteenth Amendments to the United States' Constitution, Defendants **EVANGELIDIS** and **TURCO**, and their agents, employees, and all persons acting in concert or participation with them, by failing to inspect, maintain, enforce, or correct formal and informal WCJHOC policies and customs to the standards established by law to provide constitutional modes of detainment, have thusly offended as follows:

### COUNT I

175. Maintaining policies that inhibit Plaintiff from being able to research laws, cases, definitions, and legal opinions in neither a timely or efficacious manner (¶¶ 109–112 & 115–117).

### COUNT II

176. Instructing subordinates in such a manner as to prevent Plaintiff from photocopying legal documents pertaining to this action and its filing, violating 103CMR478.11 (¶¶ 113 & 118).

### COUNT III

177. Enforcing policy that prevents Plaintiff from drafting legal documents and, to prevent him from drafting them by hand, restricts Plaintiff to his bunk in an open dorm for a majority of the day, in violation of 103CMR934.01 (¶¶ 118 & 120).

### COUNT IV

178. Witholding access to a notary public in order to prevent Plaintiff from authenticating legal documents (¶¶ 119).

### *RETALIATION*

179. **LEWIS G. EVANGELIDIS** and his agents, employess, contractors, and

persons working in concert or participation with his office, have retaliated against Plaintiff for exercising his First Amendment rights and have thusly offended as follows:

## COUNT I

180. Barring Plaintiff from seeking an inmate worker position from a Sergeant who admits that it is due to his filing of several grievances (¶ 122).

## COUNT II

181. Inhibiting certain incoming and outgoing correspondences, temporarily, regardless of their priviledged contents in what appears to be an attempts to gain an advantage over Plaintiff in the litigation of this action (¶ 124).

## COUNT III

182. Not providing Plaintiff with notary services or Certified Mail™ forms necessary to file legal papers with the courts (¶¶ 119 & 125-132).

## COUNT IV

183. Foiling Plaintiff's attempts to receive reading materials, in new condition, directly from the publisher as required by policy (¶ 133).

## COUNT V

184. Refusing to provide Plaintiff with his first order of a "Black's Law Dictionary" for a reason that is obviously false (¶ 134).

## COUNT VI

185. Refusing to provide Plaintiff with his second order of a "Black's

Law Dictionary" for a reason that is obviously false (¶ 135).

### COUNT VII

186. Refusing to provide Plaintiff with his third and final order of a "Black's Law Dictionary" for a reason that is obviously false (¶ 136).

187. Neither Plaintiff, nor society, has a plain, adequate, or complete remedy at law to redress the wrongs described herein without threats or the destructive interference of Defendants. Plaintiff, and society, has been and will continue to be irreparably injured by the conduct of Defendants, unless this Court grants the relief which Plaintiff seeks.

### XII. JURY TRIAL DEMANDED

188. Plaintiff demands a trial by jury in the resolution of all matters in this case that are so triable.

### XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgement in his favor for:

A) A preliminary and permanent injunction ordering all Defendants to abolish any formal/informal policies or customs that violate the constitutional rights of any pretrial detainee under their care and/or confinement, as each infraction upon their rights is detailed in this complaint, and to faithfully execute their respective duties as prescribed by statute and codes of regulation;

B) A declaration that the acts and omissions detailed herein, violated his rights under the Constitution and the laws of these United States;

C) Monetary relief through the Honorable Court, from **LEWIS G.**

41

**EVANGELIDIS** and **CORRECT CARE SOLUTIONS**, in their official and individual capacities, for a loss of wages, damages from disfigurement, compensation for having to suffer the unconstitutional conditions of his confinement for a period longer than one year, for the emotional distress of all aforementioned risks and damages, and punitive damages to prevent any such large and powerful entities from abusing their power in these ways again, in a sum no less than $15,000,000.00, jointly and/or severally (in a ratio to be calculated based on the net worth of each Defendant, respectively), including all attorney and court fees resultant from the litigation of this action, and whatever amounts the Honorable Court may deem just and proper; and

D) Any other relief which the Honorable Court may deem just and proper.

All sufficient to compensate him for the pains, damages, and mental anguish suffered due to the deliberate, reckless, and callous indifference as well as the substantial negligence of all Defendants.

Respectfully Submitted,

MANUEL ROBERT LUCERO V, *pro se*
(MSA# 0704851)
5 Paul X. Tivnan Dr.
West Boylston, MA

Dated: 09/17/2017

## VERIFICATION

I have read the foregoing complaint and hereby verify that the matters alleged therein are true except as to the matters that are alleged based on information and belief, and as to those, I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct.

Executed at West Boylston, Massachusetts, on September 17, 2017.

Manuel R. Lucero V