Manuel Robert Lucero V
889 Boston Turnpike Road
Suite# 222
Shrewsbury, MA 01545
mrlucerov@gmail.com
mlucero@alu.norwich.edu

*Pro Se*

# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

## WORCESTER DIVISION

| | |
|---|---|
| MANUEL ROBERT LUCERO, V, | Civil Action No.: <u>4:17-cv-40118-TSH</u> |
| PLAINTIFF, | AMENDED MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION & TEMPORARY RESTRAINING ORDER |
| vs. | |
| THOMAS A. TURCO, III, | Date: December 8th, 2017 |
| *Et al.,* | Judge: Timothy S. Hillman |
| Defendants. | |

## MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION

***Manuel Robert Lucero, V,*** (PLAINTIFF) respectfully submits this Amended Memorandum of Law in Support of his Motion for Preliminary Injunction & Temporary Restraining Order against **Thomas A. Turco, III, Lewis G. Evangelidis,** and **Correct Care Solutions, LLC** (collectively "DEFENDANTS").

I

1

# TABLE OF CONTENTS

2   TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

3   TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

4   I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

5   II. FACTORS OF A PRELIMINARY INJUNCTION . . . . . . . . . . . . . . . . . . 8

6   III. ARGUMENT . . . . .   . . . . . . . . . . . . . . . . . . . . . . . . . 8

7       A.   PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS................8

8          *HEALTH AND SAFETY*.................................12

9          *MEDICAL CARE*....................................16

10         *SEGREGATION*.....................................18

11         *FREEDOM TO ENGAGE IN INTIMATE RELATIONSHIPS*.....19

12         *ACCESS TO THE COURTS*............................22

13         *MAIL AND COMMUNICATIONS*........................26

14         *EXCESSIVE S.. . .IES*..........................28

15         *PRIVATE PHONE CALLS*............................31

16         *FIFTH AMENDMENT CLAIMS*.........................31

17         *RETALIATION*....................................33

    B.   IRREPARABLE HARM HAS COME TO PLAINTIFF AND WILL COME TO SIMILARLY SITUATED

19  PERSONS SHOULD NO INJUNCTION ISSUE ........................................34

20      C.   DE MINIMIS HARM, IF ANY, WILL BE SUFFERED BY DEFENDANTS................35

21      D.   THE PUBLIC INTEREST WILL BE GREATLY SERVED   ......................36

    IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

23  CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . 38

24

25

# TABLE OF AUTHORITIES

## Cases

**Alberti v. Klevenhagen**, 790 F.2d 1220 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**Albro v. County of Onondaga, New York**, 627 F. Supp. 1280 (N.D.N.Y. 1986) . . . . . . . . . . . . . . . . . 35

**Anderson v. City of Atlanta**, 778 F.2d 678 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . 14

**Armstrong v. Squandrito**, 152 F.3d 564 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**Avery v. Powell**, 695 F. Supp. 632 (D.N.H. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Battle v. Anderson**, 564 F.2d 388 (10th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Bell v. Wolfish**, 441 U.S. 520 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 12, 16, 17

**Bowers v. Hardwick**, 478 US 186 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**Campbell v. McGruder**, 580 F.2d 521 (D.C. Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Carty v. Turnbull**, 144 F. Supp. 2d 395 (D.V.I. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

**City of Revere v. Massachusetts General Hospital**, 463 U.S. 239 (1983) . . . . . . . . . . . . . . . . . . . . 12

**Cole v. Fisher**, 416 Fed. Appx. 111, 113 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Deerfield Medical Center v. City of Deerfield Beach**, 661 F.2d 328 (5th Cir. 1981) . . . . . . . . . . . . 35

**Detainees of Brooklyn House of Detention for Men v. Malcolm**, 520 F.2d 392 (2d Cir. 1975) . . . . . . 10

**Dixon v. Godinez**, 114 F.3d 640 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Eaton v. Bibb**, 217 F.2d 446 (7th Cir.), *cert. denied*, 350 U.S. 915 (1955) . . . . . . . . . . . . . . . . . 10

**Eisenstadt v. Bard**, 405 U.S. 438 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**Elrod v. Burns**, 427 U.S. 347, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976) . . . . . . . . . . . . . . . . . . . 35

**Estelle v. Gamble**, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251, 259 (1976) . . . . . . 16, 17, 18

**Farmer v. Brennan**, 511 U.S. 825, 837 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

**Finney v. Arkansas Board of Correction**, 505 F.2d 194 (8th Cir. 1974) . . . . . . . . . . . . . . . . . . . 36

**French v. Owens**, 777 F.2d 1250 (7th Cir. 1985), *cert. denied*, 479 U.S. 817 (1986) . . . . . . . . . . . . 15

**Gates v. Collier**, 501 F.2d 1291 (5th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 36

3

1   Gates v. Cook, 376 F.3d 323 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

2   Gibson v. County of Washoe, 290 F.3d 1175 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . 12

3   Green v. Baron, 879 F.2d 305 (8th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

  Griswald v. Connecticut, 381 US 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) . . . . . . . . . . . . . . . 21

5   Gutierrez v. Peters, 111 F.3d 1364 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

6   Hare v. City of Corinth, 74 F.3d 633 (5th Cir. 1996)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

7   Hathaway v. Coughlin, 37 F.3d 63 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

  Hewitt v. Helms, 459 U.S. 460 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

9   Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . 18

10   Holt v. Sarver, 309 F. Supp. 362 (E.D. Ark. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

11   Hoptowit v. Spellman, 753 F.2d 779 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

  Jeff v. Penner, 439 F.3d 1091 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

13   Jones v. City and County of San Francisco, 976 F. Supp. 896 (N.D. Cal. 1997) . . . . . . . . . . . . . 15

14   Laaman v. Helgemoe, 437 F. Supp. 269 (D.N.H. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

  Lawrence v. Texas, 539 U.S. 558 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 22

  Littlefield v. Deland, 641 F.2d 729 (10th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

17   Lopez v. Youngblood, 609 F. Supp. 2d 1125 (E.D. Cal. 2009) . . . . . . . . . . . . . . . . . . . . . . 37

18   Martin v. White, 742 F.2d 469 (8th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

9   Martinez-Rodriguez v. Jiminez, 409 F. Supp. 582 (D.P.R.), aff'd 551 F.2d 887 (1st Cir. 1976) . . . . . 10

  McDonald v. Stewart, 132 F.3d 225 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

  Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed 1042 (1923) . . . . . . . . . . . . . . . . . . . 21

22   Milwaukee County Pavers Assn. v. Fiedler, 707 F. Supp. 1016 (WD Wis. 1989) . . . . . . . . . . . . . 35

  Mitchell v. Dupnik, 75 F.3d 517 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

  Nance v. Kelly, 912 F.2d 605 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

25   Nelson v. Sheriff of Sullivan County, 335 F. Supp. 673 (E.D. Tenn. 1971) . . . . . . . . . . . . . . . . . 10

  New Comm Wireless Services, Inc. v. Sprintcomm, Inc., 287 F.3d 1 (1st Cir. 2002) . . . . . . . . . . . . . 9

4

Newman v. Alabama, 559 F.2d 1320 (5th Cir.), cert. denied, 42 . U.S. 948 (1975) . . . . . . . . . . . . .   16

Norris v. Frame, 585 F.2d 1183 (3d Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

Northington v. Morin, 102 F.3d 1564 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . .   14

O'Connell v. Southworth, 422 F. Supp. 182 (D.R.I. 1976) . . . .    . . . . . . . . . . . . . . .   10

Payne v. Whitmore, 325 F. Supp. 1191 (N.D. Cal. 1971) . . . . . . . . . . . . . . . . . . . .   10

Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) . . . . . . . . . . . . . . . . .   21

Powell v. Schriver, 175 F.3d 107 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . .   19

Pugh v. Locke, 406 F. Supp. 318 (M.D. Ala. 1976) . . . . . . . . . . . . . . . . . . . . . . . .   36

Ramos v. Lamm, 520 F. Supp. 1059 (D. Colo. 1981) . . . . . . . . . . . . . . . . . . . . . . .   15

Rhem v. Malcolm, 507 F.2d 333 (2d Cir. 1974), on remand, 389 F. Supp. 964 (S.D.N.Y. 1975) . . . . . .   10

Rhodes v. Chapman, 452 U.S. 337 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13,  14,  36

Rhodes v. Robinson, 612 F.2d 766 (3d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . .   13

Robinson v. Illinois State Correction Center, 890 F. Supp. 715 (N.D. Ill. 1995). . . . . . . . . . . . . . . . .   11

Roe v. Wade, 410 U.S. 113, 35 L.Ed.2d 147, 93 S.Ct. 1029 . . . . . . . . . . . . . . . . . . . .   21

Romer v. Evans, 517 U.S. 620 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

Ross v. Meese, 818 F.2d 1132 (4th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

Scott v. Moore, 85 F. 3d 230 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

Seale v. Manson, 326 F. Supp. 1375 (D.Conn. 1971) . . . . . . . . . . . . . . . . . . . . . . .   10

Sealy v. Giltner, 197 F.3d 578 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

Shepherd v. Hogan, No. 01-4047-pr, 2006 U.S. App. LEXIS 12...  at *4 (2d Cir. May 18, 2006) . . . . .   13

Smith v. Carpenter, 316 F.3d 178 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . .   13

Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) . . . . . . . . . . . . . . . . .   16

United States ex rel. Tyrell v. Speaker, 535 F.2d 823 (3d Cir. 1976) . . . . . . . . . . . . . . . .   10

Walters v. Thompson, 615 F. Supp. 330 (N.D. Ill. 1985) . . . .   . . . . . . . . . . . . . . . . .   35

Wilkinson v. Austin, 545 U.S. 209 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

Williams v. Edwards, 547 F.2d 1206 (5th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . .   15,  16,  36

MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTIO...          Case No.: 4:17-cv-40118-TSH

Wilson v. Seiter, 501 U.S. 244 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Winsby v. Walsh, 321 F. Supp. 523 (C.D. Cal. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Woods v. Smith, 60 F.3d 1161 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**Statutes**

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Massachusetts General Law, Chapter 126, Section 33 . . . . . . . . . . . . . . . . . . . . . . . . 32

**Other Authorities**

Black's Law Dictionary, at 3591 (8th Ed. 2004) ........................................................11

Beth Shuster, Sheriff Approves Handout of Condoms to Gay Inmates, L.A. Times, 11/30/01, at A38 ....22

Daryl J. Levinson, Making Government Pay: Markets, Politics and the Allocation of Constitutional Costs,

67 U. CHI. L. REV. 345 (2000)........................................................36

Myriam E. Gilles, In Defense of Making Government Pay: The Deterrent Effect of Constitutional Tort

Remedies, 35 GA. L. REV. 845 (2001)........................................................36

# I. __INTRODUCTION__

PLAINTIFF, who was a pretrial detainee at the Worcester County Jail and House of Correction (WCJHOC), has filed suit under 42 U.S.C. § 1983 and sets forth, in his verified and amended complaint (Complaint), alleged violations of his rights guaranteed by the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States, as a result of various formal and informal policies or customs within the WCJHOC as well as multiple conditions of his confinement that ultimately result in violations of not only the rights protected by the aforesaid Amendments, but also state regulations pertaining to the operational environments of correctional institutions within the Commonwealth; committed through the acts and omissions of the culpable DEFENDANTS in their failure to appropriately inspect for compliance with or enforce the maintenance of these standards, and their gross indifference to the actions of their subordinates, agents, and employees in regards to the aforementioned violations (Complaint, ¶¶ 141-187).

PLAINTIFF seeks a temporary restraining order and preliminary injunction ordering DEFENDANTS to refrain from a number of acts and abolish or correct WCJHOC policies, practices, and customs that immediately violate and continue to violate the constitutional protections applicable both to PLAINTIFF and other similarly situated pretrial detainees: to be free from any and all state-assisted punishment as unconvicted inmates, especially that punishment which is cruel and unusual under precedent or the construction of law; to be free from the deprivation of protected liberty interests without due process of law; to have equal protection under the laws of these United States as a full-citizen who has no balance to pay to society for he is not a criminal; to be free from the obscene and wanton invasion of bodily and social privacy by an arm of the state; and, to be free from having private property seized for public use without just compensation.

1    PLAINTIFF respectfully requests that this Honorable Court grant his Motion for

2    Preliminary Injunction & Temporary Restraining Order. As grounds for this request,

3    PLAINTIFF states that he is entitled to the just relief he seeks.

4

5    ## II.    FACTORS OF A PRELIMINARY INJUNCTION

6    The Court considers four general factors in consideration of the decision to grant

7    any preliminary injunction: "(1) the movant's probability of success on the merits, (2) the

8    likelihood of irreparable harm absent preliminary injunctive relief, (3) a comparison

9    between the harm to the movant if no injunction issues and harm to the objectors if one

10   does issue, and (4) how the granting or denial of an injunction will interact with the public

11   interest." New Comm Wireless Services, Inc. v. Sprintcom, Inc., 287 F.3d 1, 8-9 (1st Cir.

12   2002). Nevertheless, "[t]he *sine qua non* of this four-part inquiry is likelihood of success on

13   the merits: if the moving party cannot demonstrate that he is likely to succeed [on the

14   merits] in his quest, the remaining factors become matters of idle curiosity." Id., at 9.

15

16   ## III.   ARGUMENT

17   ### A.    PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS

18   PLAINTIFF has set forth many facts of DEFENDANTS' acts and omissions which have

19   violated his rights and therefore has a substantial likelihood of success on the merits.

20   The Supreme Court's 1995 decision in Sandin v. Conner, 515 U.S. 472, 115 S.Ct.

21   2293, 132 L.Ed.2d 418 (1995), has directed courts to focus on the "nature of the

22   deprivation of an incarcerated person's constitutional rights. 115 S.Ct., at 2299.

23   All WCJHOC administrators and agents must create and enforce policy that bears a

24   reasonable relationship to valid governmental interests when it comes to pretrial

25   detainees. Rules or customs which infringe on constitutional rights bear strict scrutiny by

8

the courts and must be struck down if unreasonable or arbitrary. Eaton v. Bibb, 217 F.2d 446 (7th Cir.), *cert. denied*, 350 U.S. 915 (1955) (*See also* Norris v. Frame, 585 F.2d 1183 (3d Cir. 1978); Seale v. Manson, 326 F. Supp. 1375 (D.Conn. 1971); O'Connell v. Southworth, 422 F. Supp. 182 (D...... 1976); Winsby v. Walsh, 321 F. Supp. 523 (C.D. Cal. 1971); Nelson v. Sheriff of Sullivan County, 335 F. Supp. 673 (E.D. Tenn. 1971); Payne v. Whitmore, 325 F. Supp. 1191 (N.D. Cal. 1971)).

It should be noted that throughout this case, PLAINTIFF insists upon the strict distinction between pretrial detainees and prisoners. Detainees, being unconvicted of any crime, are solely detained for the purpose of ensuring their presence in court, not for any kind of punishment. *See* Bell v. Wolfish, 441 U.S. 520 (1979); Norris, *supra*; Littlefield v. Deland, 641 F.2d 729 (10th Cir. 1981) (holding pretrial detainee for 56 days in a stripped cell for disorderly conduct was punishment and a violation of Due Process Clause); Armstrong v. Squandrito, 152 F.3d 564 (7th Cir. 1998) (pretrial detainee held in error established §1983 claim under substantive due process).

Under such distinction, WCJHOC policies and actions may only impose those restrictions on pretrial detainees which are necessary to maintain security and transport them to the courts for their pending matters (*See* Rhem v. Malcolm, 507 F.2d 333 (2d Cir. 1974), *on remand*, 389 F. Supp. 964 (S.D.N.Y. 1975)). Any extra deprivations of the rights of pretrial detainees must be thoroughly justified by the most compelling necessity, and administrators should never impose more restrictions on them than on prisoners. United States *ex rel.* Tyrell v. Speaker, 535 F.2d 823 (3d Cir. 1976) & Detainees of Brooklyn House of Detention for Men v. Malcolm, 520 F.2d 392 (2d Cir. 1975), *on remand*, 421 F. Supp. 832 (E.D.N.Y. 1976) (*See* Martinez-Rodriguez v. Jiminez, 4... F. Supp. 582 (D.P.R.), *aff'd*, 551 F.2d 887 (1st Cir. 19... & Hare v. City of Corinth, 74 F.3d 633 (5th Cir. 1996)).

9

For pretrial detainees, even if the restrictions are related to a legitimate governmental interest, if the deprivations are excessive in relation to their purpose, an intent to punish is to be automatically inferred. Green v. Baron, 879 F.2d 305 (8th Cir. 1989). A claimant is able to state that a deliberate deprivation of constitutional rights occurs when there is either an actual direct intent to deprive them of those rights, or when an individual has ignored a known threat to these constitutional protections. Martin v. White, 742 F.2d 469 (8th Cir. 1984).

Even when no injury has occurred, the simple fact that a risk is presented by the deprivation is enough upon which to state a valid claim. Robinson v. Illinois State Correction Center, 890 F. Supp. 715 (N.D. Ill. 1995).

*Eighth Amendment Claims*

In terms of claims regarding unconstitutional jail conditions, the Eighth Amendment protects prisoners from suffering cruel and unusual punishment by state actors. However, since PLAINTIFF, as a pretrial detainee, is unpunishable, there is not an expectation of protected interests that correspond with the invocation of the Eighth Amendment in his case. Therefore, the Court shall, more commonly, review similar claims as those that would be brought under Eighth Amendment scrutiny, under the Due Process Clause of the Fourteenth Amendment. Bell, *supra*.

In Bell, the Supreme Court held that any jail condition that amounts to punishment, whether cruel and unusual or not, is a violation of a pretrial detainees right to due process. The Court also explained the difference between punishment, which is unconstitutional, and regulations that, while unpleasant, have a valid purpose by being reasonably related to Government's interest in maintenance of custody and facility security.

10

Many of PLAINTIFF's claims concern policies ...... customs that, according to staff, are for the purpose of "rehabilitation" or other "legitimate penological interests". 'Penological', as a word in itself, implies an overtone of punishment through both its common connotations and its literal annotation (the adjective form of *penology* – "... *the punishment and rehabilitation of criminals, including the art of fitting the right treatment to an offender.*" Black's Law Dictionary, at 3591 (8th Ed. 2004)). 'Rehabilitation' is an interest that is also directly related to the correction of those who have committed a crime. This indicates that the policies and customs are, in fact, created with the intent of affecting a climate of punishment or correction upon all inmates, regardless to their status as pretrial detainees.

Even if it was to be assumed *arguendo* that these policies are not intended to punish detainees, the imposition of these conditions are not related to any legitimate governmental interests in maintain the security and custody of pretrial inmates. The regulations or customs in PLAINTIFF's claims are either overly restrictive or an exaggerated response to a real concern.

Although the Bell standard is well-established for analyzing most claims of pretrial detainees, their due process protections are quite possibly greater than the Eighth Amendment protections of convicted prisoners. City of Revere v. Massachusetts General Hospital, 463 U.S. 239, 244 (1983) & Bell, *supra*. Detainees should, in fact, have significantly more extensive due process protections than a convicted prisoner's right to humane conditions. Gibson v. County of Washoe, 290 F.3d 1175, 1188 n.9 (9th Cir. 2002) & Alberti v. Klevenhagen, 790 F.2d 1220, 1224 (5th Cir. 1986). But it seems common, at the present time, throughout the courts for such claims to be compared with Eighth Amendment precedents.

1    Eighth Amendment claims can be brought by an inmate who applies the "deliberate

2    indifference" standard (the imposition of a condition of confinement that denies an obvious

3    human need and that an institution official was deliberately indifferent to that "identifiable

4    human need"). Wilson v. Seiter, 501 U.S. 244, 303-304 (1991). *See* Cole v. Fisher, 416 Fed.

5    Appx. 111, 113 (2d Cir. 2011) (confirmed the subjective and objective prongs of the

6    deliberate indifference test).

7    Even if only a risk of harm exists to the health and safety of an incarcerated

8    individual, if an institution official knows why a harm exists and then decides to ignore it,

9    they are violating the inmate's Eighth Amendment protections. Farmer v. Brennan, 511 U.S.

10    825, 837 (1995) (*See* Shepherd v. Hogan, No. 04-4047, 2006 U.S. App. LEXIS 12457, at *4

11    (2d Cir. May 18, 2006) (unpublished) (finding that future risk can be enough to constitute a

12    "substantial risk of serious harm", even if no symptoms are currently present) & Smith v.

13    Carpenter, 316 F.3d 178, 188 (2d Cir. 2003) ("[A]n Eighth Amendment claim may be based

14    on... exposing an inmate to an unreasonable risk of future harm and... actual physical injury

15    is not necessary in order to demonstrate an Eighth Amendment violation.").

16

17    *HEALTH AND SAFETY*

18    Although WCHOC administrators are given a broad discretion in the day-to-day

19    machinations relevant to jail maintenance and order, this Court *must* intervene if the

20    conditions threaten the health and safety of any inmate or infringe upon any constitutional

21    right (*See* Rhodes v. Robinson, 612 F.2d 766 (3d Cir. 1979) (emotional distress violates

22    Eighth Amendment; Avery v. Powell, 695 F. Supp. 632 (D.N.H. 1988) (inmate who alleged

23    health endangerment by secondhand smoke had stated a valid claim under §1983)).

24    The Supreme Court considered these Eighth Amendment claims and issues in

25    Rhodes v. Chapman, 452 U.S. 337 (1981), where they observed:

MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION          Case No.: 4:17-cv-40118-TSH

*"Conditions must not involve the unnecessary and wanton infliction of pain, nor may they be grossly disproportionate to the [crime] warranting imprisonment..." Id.*, at 347.

Since a pretrial detainee is unconvicted of any crime, any punishment or "unnecessary or wanton infliction of pain" is unconstitutional. "The Eighth Amendment is intended to protect and safeguard a prison inmate from an environment where degeneration is probable and self-improvement is unlikely because of conditions existing which inflict needless suffering, whether physical or mental." Battle v. Anderson, 549 F.2d 388, 393 (10th Cir. 1977).

For WCJHOC officials to not be guilt of a constitutional deprivation, their acts and omissions must not deprive any inmate of the "minimal measure of life's necessities" Rhodes, at *supra*. However, as was mentioned earlier, Farmer v. Brennan, through an opinion by Justice Souter, added a subjective aspect to the Rhodes formulation: that an official has been deliberately indifferent to an inmate's Eighth Amendment right to humane conditions if he knew that the inmate faced a risk of harm and disregarded the risk by failing to take reasonable measures to abate it.

Therefore, any condition likely to impair the physical or mental health of any pretrial detainee, should be placed under the utmost scrutiny and can only be justified by the most compelling necessity (See generally Campbell v. McGruder, 580 F.2d 521 (D.C. Cir. 1978); Anderson v. City of Atlanta, 778 F.2d 678 (11th Cir. 1985); Scott v. Moore, 85 F.3d 230 (5th Cir. 1996); Northington v. Morin, 102 F.3d 1564 (10th Cir. 1996)).

Almost all of PLAINTIFF's claims regarding unconstitutional conditions of health and safety within the facility are also in violation of various Codes of Massachusetts

13

Regulations (CMRs) (Complaint ¶¶ 143-153) that provide the minimum standards for such environmental considerations.

Although it is true that constitutional questions do not arrive to judicial scrutiny just "because an inmate [was] treated at variance with state law", such a failure to comply with state norms can be "significant" in a finding of unconstitutional conditions. Gates v. Collier, 501 F.2d, at 1302.

Fire safety codes can even be used as a standard for human habitation. William v. Edwards, 547 F.2d __ 6 (5th Cir. 1977). Successful Eighth Amendment claims have been made on such things as inadequate lighting, noise levels, living space, ventilation, hot and cold running water, clothing, bedding, mattresses, furniture, and, once again, fire safety. See French v. Owens, 777 F.2d 1250 (7th Cir. 1985), cert. denied, 479 U.S. 817 (1986); Hoptowit v. Spellman, 753 F.__ 79 (9th Cir. 1985); Gates v. Cook, 376 F.3d 323, 334, 339-40 (5th Cir. 2004) (determining that the probability of illness states an Eighth Amendment claim); Dixon v. Godinez, 114 F.3d 640, 643-44 (7th Cir. 1997) (holding that officials' deliberated indifference to cold temperatures is sufficient to state a claim); Jones v. City and County of San Francisco, 976 F. Supp. 896 (N.D. Cal. 1997); Ramos v. Lamm, 520 F. Supp. 1059 (D. Colo. 1981).

In regard to the conditions within the WCJHOC and the Court's determination of their constitutionality, it is "significant that the current conditions at [the facility] even fail to comply with state standards, much less constitutional norms." Gates, at supra. State codes reveal to the Court the minimum standards by which the state proposes to govern itself concerning habitability, and such a standard is a valuable reference into what is minimal for incarceration in the public view, thus serving as an index into the "evolving standards of decency that mark the progress of a maturing society." Estelle v. Gamble, 429

14

U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251, 259 (1976) (citing <u>Trop v. Dulles</u>, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630, 642 (1958)).

"State Codes are... what levels of decency the public, expressing itself throught the Legislature, is prepared to pay for," and by using the codes "the federal district judge can minimize its intrusion into the details of prison administration, allowing the state's own published standard... govern." <u>Williams v. Edwards</u>, 547 F.2d 1206, 1214 (5th Cir. 1997) (quoting <u>Newman v. Alabama</u>, 503 F.2d, at 1330, n. 14).

With a particular condition, the one regarding detainees being restricted to the area immediately surrounding their bunks for a majority of the day and forcing every eight of one-hundred pretrial detainees in the open dormitory of the Annex Building to restrict their movements to an area that would not even satisfy regulations of a two-man cell (Complaint, ¶¶ 34-36), let alone satisfy the state code regulating the space available for detainees in an open dorm, one can associate such a predicament with a condition of overcrowding. However, unlike most cases of overcrowding, the simple act of abolishing the 'bunk-restriction' policy would restore the condition to a constitutional level and alleviate the pressures related to such a condition, like those on privacy or increases in violence and aggravation amongst inmates.

In <u>Bell</u>, the Supreme Court has even indicated that "confining a given number of [detainees] in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment." <u>Id.</u>, at 542. It should be reiterated that PLAINTIFF has been forced to endure those conditions, and worse, for nearly two years. Yet, there are detainees who have been held for over six years awaiting trial, so two years is not an atypical length of time.

15

Even in the facts of <u>Bell</u>, pretrial detainees wer... ...ly required to spend seven or eight hours each da... ... the sleeping area of a dormito... ...and were free to move about the common area for the remaining sixteen or seventeen hours of the day. MCI Gardner, a state *prison* here in Massachusetts, has a similar open dorm condition to those of the Annex and <u>Bell</u>, except the convicted prisoners therein are neve... ...stricted to their sleeping areas and have free access to ...enities like showers or simple ro...ning about, at any time throughout the day when a 'count' is not being implemented.

It should be further noted that there are more than ten cameras, most of which are night-vision capable, that are viewing inmates at all th... ...within the open space of the Annex Building, inc... ...ng whilst they shower or use ...e ...oilets. This measure is more than sufficient to quell any concerns of supervisory burdens, though such concerns were obviously never presented by the administrators of the much larger facility in <u>Bell</u>, despite its similarities to the instant case.

*MEDICAL CARE*

Since each pretrial detainee in the Annex Building "must rely on [facility] administrators to treat his medical needs" and "if the ...orities fail to do so, those needs will not be met," P...TIFF has brought claims regar...ng DEFENDANTS' acts and omissions that have inhibited his access to adequate medical care. <u>Estelle v. Gamble</u>, 429 U.S. 97, 103 (1976).

<u>Estelle</u> has required the show of three element... i.. a claim of inadequate acce... to medical care: (1) a ...ous medical need existed, (2) a...orities were deliberately indifferent to that serious medical need, and (3) a denial to said access could be the direct cause of future ailment or injury. "These elementary principles establish the government's obligation to provide medical care for those whom it ... ...nishing by incarceration." <u>Ibid</u>.

16

1        A serious medical need has been defined as a medical issue diagnosed by a physician

2  or one "that is so obvious that even a lay person would easily recognize the necessity for a

3  doctor's attention. ... _v. Dekalb Reg'l Youth Det. Ctr._, 40 F.3d 1176, 1187 (11th Cir. 1994)

4  (_See_ _Hathaway v. Coughlin_, 37 F.3d 63, 66 (2d Cir. 1999) (quoting _Nance v. Kelly_, 912 F.2d

5  605, 607 (2d Cir. 1990) (Pratt, J., dissenting))(a serious medical need is a "condition of

6  urgency, one that may produce death, degeneration, or extreme pain.")).

7        _Estelle_, at 104, moreso indicates that a serious medical need is presented if the

8  "failure to treat a prisoner's condition could result in further infliction of injury or the

9  'unnecessary and wanton infliction of pain.'" _Jeff v. Penner_, 439 F.3d 1091, 1096 (9th Cir.

10  2006).

11        To show deliberate indifference, PLAINTIFF has shown in his Complaint (¶¶ 167-

12  173) that officials were aware of his serious medical needs and nonetheless failed to

13  respond to it. _Estelle_, at _supra_, & _Gutierrez v. Peters_, 111 F.3d 1364, 1369 (7th Cir. 1997).

14        PLAINTIFF has also shown the third aspect of causation. He has suffered needless

15  and irreparable injury as a result of this violation through the decay of his tooth and the

16  subsequent neurological infection of bacterial meningitis (Complaint, ¶¶ 95 – 100).

17  Inadequate access to medical care is also indicated by the state of the training of staff

18  charged with the care of inmates in the Annex Building, who have incontrovertibly proven

19  themselves to be so inadequately trained "so as to be directly culpable for the death of an

20  inmate [in the Annex]", and such substandard training specifically violates state code

21  (Complaint, ¶¶ 91 & 93).

22        When PLAINTIFF had requested access to his medical records to verify his lack of

23  adequate treatment or thorough physical assessment (Complaint, ¶¶ 77 & 78), he was

24  deflected and denied personal access to them with blatant contrariety to the stipulations of

25

state law, yet in full accordance with Worcester County Sheriff's Office (WCSO) and Correct Care Solutions, LLC, (CCS) policy/custom (Complaint, ¶¶ 79 & 80).

"[T]he right to confidentiality includes the right... protection regarding information about the state of one's health... [because]... there are few matters that are quite so personal as the status of one's health... the dissemination of which one would prefer to maintain greater control over." Powell v. Schriver, 175 F.3d 107, 111-113 (2d Cir. 1999).

**Fourteenth Amendment Claims**

PLAINTIFF, as a pretrial detainee, is afforded more rights to due process than convicted prisoners, under the Constitution's Fourteenth Amendment.

*SEGREGATION.*

A pretrial detainee's Fourteenth Amendment protections are obviously much greater than prisoners' when it comes to placement into any segregation that deviates greatly from the standards of their previous housing assignment.

In the WCJHOC, however, detainees in the Annex Building are never given hearings or any procedures detailed by statute to facilitate due process protections prior to being placed in disciplinary segregation or administrative segregation, even when the alleged rule-infractions are non-violent and non-security-compromising (such as "swearing", "lying", "receiving money for providing legal assistance", or "giving anything of value to another inmate") (Complaint, ¶¶ 61-63). The conditions in disciplinary/administrative segregation are sub-animal, let alone sub-human (Complaint, ¶ 63), so are obvious departures from both PLAINTIFF's original housing assignment and the ordinary incidents of institutional life.

18

On every occasion when PLAINTIFF was placed into administrative segregation (ADM) (segregation for 'administrative' reasons and not for any disciplinary action, however it takes place in the same unit and under the same conditions: A-2) after he had completed his disciplinary sanctions for an alleged rule violation, he was never given a hearing or any indication as to how long he would be on ADM status, or any indication that he was even on ADM status, for the conditions are the exact same as those of disciplinary segregation (Complaint, ¶ 64). Such policies in the WCHOC directly violate his rights to due process. Hewitt v. Helms, 459 U.S. 460 (1983) & Carlo v. Dupnik, 75 F.3d 517, 524 (9th Cir. 1996).

Even though the WCSO may have great freedom in its discretion regarding the decision to place inmates on ADM status, when conditions are exceptionally harsh when compared to their previous housing assignment (for PLAINTIFF, this was the Annex Building), procedural due process protections are invoked. Wilkinson v. Austin, 545 U.S. 209 (2009) & Sealy v. Giltner, 197 F.3d 578 (2d Cir. 1999).

*FREEDOM TO ENGAGE IN INTIMATE RELATIONSHIPS*

PLAINTIFF claims that a WCSO policy that prohibits pretrial detainees from all acts of consensual intimate activity, whether or not that activity is sexual, is unconstitutional.

There are several merits to this claim. First, it should be noted that in Lawrence v. Texas, 539 U.S. 558 (2003), the Supreme Court decided that it was unconstitutional for any state to establish a law prohibiting consensual sex between two people of the same sex, and since then there has been no clear indication by the courts as to whether or not this should be automatically applied to pretrial detainees. However, multiple opinions of the Supreme Court have long held that the lower courts must maintain a broad interpretation of the Due Process Clause and its protection of the substantive reaches of liberty in the life of the

19

individual. *See* Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), & Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed 1042 (1923).

Nevertheless, the Supreme Court considers its first decision most relative to the issues in Lawrence would be Griswald v. Connecticut, 381 US 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). The Court found that a law prohibiting the use of contraceptives was unconstitutional and that the protected liberty interest was in the marital relation and marital sex. Id., at 485.

It would later be established that the right to make certain decisions regarding sexual conduct goes far beyond the institution of marriage. In Eisenstadt v. Bard, 405 U.S. 438 (1972), the Court held that a law against the distribution of birth control to unmarried persons was unconstitutional. What is interesting is that the case was decided under the Equal Protection Clause of the Fourteenth Amendment. Id., at 454. However, the major position was that the law was found to impair a fundamental human right. The Court stated:

*"It is true that in Griswald the right to privacy inhered to the marital relationship... If the right of privacy means anything, it is the right of the individual, married or single, to be free from government intrusion into matters so fundamentally affecting a person as the decision to bear or beget a child."* Id., at 453.

When the Court had later decided on a case involving the substantial protection of the right to abortion. They cited some cases that protected spatial freedoms and other cases that go far beyond it. Roe v. Wade, 410 U.S. 113, 35 L.Ed.2d 147, 93 S.Ct. 1029. The decisions therein recognized the right of the individual to make certain fundamental decisions affecting their destiny and confirmed that the protection of liberty under the Due

MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION        Case No.: 4:17-cv-40118-TSH

Process Clause has a substantive dimension of fundamental significance in defining the rights of the person.

But also see the case which <u>Lawrence</u> overruled, <u>Bowers v. Hardwick</u>, 478 US 186 (1986), where a Georgia sodomy statute was upheld. In <u>Lawrence</u>, the Court held:

> *"To say that the issue in Bowers was simply the right to engage in certain sexual conduct demeans the claims the individual put forward, just as it would demean a married couple were it to be said that marriage is simply about the right to have sexual intercourse."* <u>Lawrence</u>, at 567.

The WCSO policy and any regulatory statute preventing pretrial detainees from engaging in any intimate conduct, sexual or otherwise, imposes upon a fundamental liberty that's deprivation serves no legitimate governmental purpose or is an exaggerated response to any reasonable one, when a pretrial detainee should only be subject to those restrictions that maintain custody and transport them to and from the courts. Although such a policy or statute may be intended to do no more than prohibit a particular sexual act, its consequences touch upon the most private of human conduct, sexual behavior. The policy seeks to control a personal relationship that is within the protected liberty interest of people to choose without being punished like *criminals*. <u>Lawrence</u>, at *supra*.

It may be argued that in regard to PLAINTIFF's claims that the policy violates his right to a relationship with another detainee, the policy is not discriminating against non-heterosexual detainees. Nevertheless, "[w]hile it is true that the law applies only to conduct, the conduct targeted by this law is conduct that is closely correlated with being homosexual... 'After all, there can hardly be more palpable discrimination against a class than making the conduct that defines the class criminal.'" <u>Lawrence v. Texas</u>, 539 U.S. 583 (2003) (O'Connor, J., concurring.) (quoting <u>Romer v. Evans</u>, 517 U.S., at 641 (Scalia, J.,

21

dissenting.). This invokes Equal Protection by the Constitution. Some states have found such conduct to be protected to the point that correctional policy has reflected such and gone insofar as to take proactive measures to facilitate the safe exercise of sexual conduct among pretrial detainees. *See* Beth Shuster, Sheriff Approves Handout of Condoms to Gay Inmates, L.A. Times, Nov. 30, 2001, at A38.

"These matters, involving the most intimate and personal choices a person can make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood, were they formed under the compulsion of the state." Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 851, 112 S.Ct. 2791, 120 L.Ed.2d 674.

## First Amendment Claims

*ACCESS TO THE COURTS*

Some of PLAINTIFF's First and Fourteenth Amendment claims include the WCSO's inhibition of his access to the courts, as stated in the Complaint, by: the needless restrictions imposed on his limited access to the single LexisNexis™ terminal available to the 100 detainees in the Annex Building and the various methods employed by staff to further inhibit the effective use of it by doing such things as withholding or refusing to replace an ink cartridge in the terminal's printer in what, based on a statement by a staff member, is an effort by the WCSO to impede the litigation of this action (Complaint, ¶ 116); the denial of access to photocopies of legal documents pertinent to both his criminal defense and the litigation of this action, in violation of a state regulation (Complaint, ¶ 176); the direct and total refusal by the WCSO to provide him with notary services to

22

certify legal documents, under the advisement of the office's General Counsel (Complaint, ¶ 119); and the restriction of free access to writing surfaces such as a desk or table, in an open dormitory (Complaint, ¶ 177).

It is well established that in order for a claim to be successful in any dispute of access to the courts, PLAINTIFF must show that he will imminently suffer actual injury. More specifically, "[i]t is the role of the courts to provide relief to claimants... who have suffered or will imminently suffer actual harm." Lewis v. Casey, 518 U.S. 343, 349 (1996). PLAINTIFF details in his complaint that such access violations hinder his ability "to render efficacious *pro se* litigation" (Complaint, ¶ 112). This indicates that as a lay individual in matters of law, who is fully aware of his professional limitations, PLAINTIFF is not confident in his ability to represent himself in this action where experienced litigators, who have likely practiced law for longer than his twenty years of life, are representing DEFENDANTS. Should Access to the Courts be optimized, PLAINTIFF contends that all pretrial detainees in the Annex Building could competently litigate with the materials and services afforded them by the LexisNexis™ terminal and facility photocopiers, or utilize a notary public to certify documents, and prepare legal papers. Every detainee's ability to litigate their defense or against the conditions of their confinement is directly sociable to their Access to the Courts when considering the facts presented in the Complaint, and the WCSO's policies and customs, by inhibiting such access present an predicament that in many situations will cause the detainees of the Annex Building to "imminently suffer actual harm," through the very real possibility of a half-baked criminal defense or the technical dismissal of a civil rights action against their imprisoners due to the inability to meet the time limitations of various procedural rules, an inability to effectively rebut or defend (*See* Benjamin v. Kerile, 102 F. Supp. 2d 157 (S.D.N.Y. 2000), an inability to make photocopies of motions or exhibits for service, and a general lack of proficiency and ignorance to the

23

law. *See* DeMallory v. Allen, 855 F.2d 442 (7th Cir. 1988) (where limitations on library use prevent timely filing of briefs, those limitations are sufficiently prejudicial to sustain an Access to the Courts claim); Tillery v. Owens, 719 F. Supp. 1256 (W.D. Pa. 1989) (four hours of library access per month is not sufficient to provide access to the Courts) (*See also* Complaint, ¶ 109); Allen v. Sakai, 40 F.3d 1001 (9th Cir. 1994), *cert. denied*, 514 U.S. 1065 (1995) (Access to the Courts was denied by refusing to provide inmate with pen and denying the use of photocopier); Collins v. Goord, 438 F. Supp. 2d 399 (S.D.N.Y. 2006) (photocopying frustrated).

Every inmate has a right, protected by the Constitution, to either adequate law libraries or assistance by those trained in law. Blake v. Berman, 877 F.2d 145 (1st Cir. 1989). But *at no point in time* shall pretrial detainees be subject to conditions that affect the outcome of litigation, or even affect their mental alertness at trial. Campbell v. McGruder, 580 F.2d 521, 531-34 (D.C. Cir. 1978).

An average of one hour of access every eight days to the LexisNexis™ terminal, cannot be reasonable or objectively figured to be an adequate amount of meaningful access.

In terms of the issue these restrictions present to a detainee's defense in the state courts, it would be outside of the best interests of Justice and Liberty to require that an actual injury occur before a constitutionally deficient policy affecting Access to the Courts can be rectified, for retroactive relief could not possibly amount to the costs incurred by an "actual injury" where someone was wrongfully convicted of any crime. An injury that can easily be safeguarded against by preemptive judicial intervention in the chronic denial of such a crucial right to pretrial detainees.

There should obviously be a higher standard of protection for this right in comparison with every other protected interest, especially for those with pending criminal matters, since all violations of other rights can only be redressed by the meaningful

24

exercise of Access to the Courts. *See* <u>Cody v. Weber</u>, 2... ..3d 764 (8th Cir. 2001) (the Court of Appeals determi...... that the simple "impairment of a legal claim was sufficient to state an Access to the Courts violation, even if the case has not been lost yet).

If the Honorable Court does not accept this reasoning, however, Plaintiff presents factors outside of the realm of First and Fourteenth A........dment claims that are more relative to his Eigh...... .....d Fourteenth Amendment clai.... as detailed previously.

Since, in the Annex Building, detainees are restricted to their bunks for a majority of the 24-hour day (Complaint, ¶¶ 143 & 177), they must take the only periods of 'free-movement' around the dormitory area and "day-side" ... choose between calling loved-ones, showering, at......ding religious services, attend......a visit, exercising, engaging in outdoor recreation, ordering commissary, washing food storage containers, using desks and tables to write letters or prepare legal papers, or utilizing the LexisNexis™ terminal (if the individual is permitted by the 'Social Worker' to do ...). The presence of restrictions requiring that these a...ivities occur within the same l....ited time frame and that the fact and the fact that the 'social worker' is only available from 0900 to 1045 and 1230 to 1430 (making access to the LexisNexis™ terminal available only twice, since there are only two 'free-movement' peri...s within these time frames) to ...prove and remove the electronic law library from his o...ce, presents a constant ultima.... as to which right detainees wish to exercise in sacrifice of the opportunity to exercise another during these periods where they are not restricted to their respective bunk-areas, in an open dormitory. "[A]n inmate cannot be forced to ...crifice one constitutionally prote...ed right solely because another is respected." <u>Allen v. ...ty of Honolulu</u>, 39 F.3d 936, 940 (9th Cir. 1994).

The Court should consider that due to the consequential denial of Access to the Courts by the violation of another set of constitution... ...ghts, the standard of "actual harm" in <u>Casey</u>, at *supra*, s...ld be disregarded under the p... ...se that the violation is no longer

1  being scrutinized under a protection of Access to the Courts, but as a punishment/due

2  process issue of the conditions surrounding its causat... Salahuddin v. Goord, 467 F.3d

3  263 (2d Cir. 2006) (a prisoner was not allowed to attend religious services if he wished to

4  use the law library; since the case was then about the free exercise of religion, the plaintiff

5  did not have to show "actual harm") & Kaufman v. Schneiter, 474 F. Supp. 2d 1014 (W.D.

6  Wisc. 2007) (the court had found an Eighth Amendment violation when a prisoner was

7  faced with choosing between using limited recreational time to either exercise or use the

8  law library).

9        As the Supreme Court has established the protection of Access to the Courts in *Ex*

10  *Parte* Hull, 312 U.S. 546 (1941), Johnson v. Avery, 383 U.S. 483 (1969), & Bounds v. Smith,

11  430 U.S. 817 (1977), the right to such access for incarcerated persons is not just limited to

12  criminal defenses, but also the litigation of a civil action.

13

14  *MAIL AND COMMUNICATIONS*

15        The rights to speech and association govern issues concerning mail and

16  communications. Almost all rights of the First Amendment are analyzed under a test

17  established by Turner v. Safley, 482 U.S. 78 (1987). This test requires that, in determining

18  the First Amendment constitutionality of a facility policy, one must consider the following:

19  (1) that the policy is reasonably related to a legitimate and neutral governmental interest;

20  (2) whether the policy leaves open an alternative means to exercise First Amendment

21  rights; (3) how the issue impacts the facility, its employees, and its resources; and, (4) if

22  there are obvious alternatives to the regulation that would not restrict the rights to free

23  expression and association.

24        PLAINTIFF, at multiple points during his detainment, was placed on ADM status.

25  The conditions in the ADM unit are identical to the segregation unit with the sole exception

1   of being able to make phone calls in place of your hour allotment to shower and sparse

2   visitation. No periodicals, magazines, books, or other materials that a detainee may receive

3   by mail are permitted in the detainee's possession. Yet inmates on ADM status are not

4   being punished for the violation of a facility rule. (Complaint, ¶¶ 61-65).

5      Applicability of the Turner standard to policies concerning publications and reading

6   materials was confirmed in Thornburgh v. Abbot, 490 US 401, 404 (1989). A similar issue

7   to the one at bar was presented before a southern court in Spellman v. Hopper, 95 F. Supp.

8   2d 1267 (M.D. Al. 1999), the court overturned a ban on all subscription newspapers and

9   magazines for inmates in segregation because it meant the inmates were kept from reading

10  all magazines, a problem under the second Turner question. The court also decided that the

11  rule wasn't reasonably related to the prison's interest in punishment, cleanliness, or

12  security, a problem under the first Turner question.

13     The WCSO also has a policy that bans, in any unit of the WCJHOC, any non-legal mail

14  that is not sent on white-lined paper only and written in blue or black ink, in plain white

15  envelopes without sticker labels or discoloration of any sort, with no exceptions. This

16  regulation is an excessive response to the reasonable interest of security and prevents

17  family and friends from being able to send things such as the text from internet-generated

18  articles or a typed letter of any sort, even if it's in black-and-white. Other courts have found

19  far less restrictive regulations to be unconstitutional. See Clement v. California Dep't of

20  Corr., 220 F. Supp. 2d 1098 (N.D. Cal. 2002), aff'd, 364 F.3d 1148 (9th Cir. 2004) (ban on

21  mail containing internet-generated materials was unreasonable)). The deprivation of these

22  rights is even more serious for pretrial detainees and deserves the utmost scrutiny.

23     The WCSO has no reason to ban all books, magazines, periodicals, newspapers, or

24  cards to individuals in administrative segregation, nor do they have any reason to force all

25  personal mail to be written on white-lined paper only. There is also no alternative by which

27

detainees can exercise these rights to mail and communication. Needless to say, these

2  regulations fail to meet the <u>Turner</u> standard.

3

4  **Fourth Amendment Claims**

5  *EXCESSIVE SEARCHES*

6      It is necessary to indicate that all pretrial detainees retain a limited but reasonable

7  expectation of privacy under the Fourth Amendment that protects him from searches that

8  are not done for the legitimate purpose of security. United States v. Cohen, 796 F.2d 20 (2d

9  Cir. 1986).

10      When a detainee is transported to court from the Annex Building, he is searched

11  several times between his departure from the Annex Building to the central complex, and

12  from the complex to court, then from court back to the complex, and then from the complex

13  back to the Annex (Complaint, ¶¶ 69, 70, & 160).

14      During this entire process, detainees never leave the supervision or monitor of

15  correctional and court officers. There is thusly no reasonable suspicion that there may have

16  been some acquisition of contraband that would warrant so many thorough searches.

17  Especially with the policy forcing inmates to endure a full visual body cavity search

18  including the mouth and anorectal areas, and then go through an x-ray full-body scan

19  immediately after the cavity-search, every time they return from secure court holding

20  areas. The use of just the x-ray body scanner without the cavity/strip search of the subject

21  detainee, without an objectively reasonable suspicion that he specifically has secreted

22  contraband despite the constant supervision of officers, would be sufficient and serves the

23  exact same level of scrutiny into his body as a cavity search, and, while it stills only some of

24  that intrusion into bodily privacy, it is the optimal balance between allowing the facility to

25  accomplish its goal of security whilst still respecting the constitutional rights of its inmates.

28

The policy's use of ... the cavity search and the x-ray ... indicative of the searches' excessive nature and seems to be designed to embarrass, demean, and establish dominance over pretrial detainees, rather than be related to any legitimate interests. *See* Jean-Laurent v. Wilkenson, 540 F. Supp. 2d 501 (S.D.N.Y. 2008) (the court stated that a second strip search was unconstitutional because the inmate was under constant supervision since the first search); Farmer v. Perrill, 288 F.3d 1254, 1260 (10th Cir. 2002) (holding that the prisoner has "the right not to be subjected to a humiliating strip-search in full view of [many] others unless the procedure is reasonably related to a legitimate penological interest").

Strip searches in this Court are defined as "exposing one's naked body to official scrutiny" and "[t]he critical question is whether viewing the naked body was an objective of the search, rather than an unavoidable by-product." Wood v. Hancock County Sheriff's Dept., 354 F.3d 57, 65 (1st Cir. 2003). That case held that a strip search does not necessarily have to involve inspection of the mouth or underarms. This puts the search that all detainees must endure after every court appearance beyond the consequence of a mere strip search as they have to expose and spread all body cavities for an officer's inspection. Viewing the naked body must be an objective of the search when one considers the fact that an x-ray body scanner is used immediately after the strip search and is in the immediate vicinity of the cavity search area; the body scanner obviously provides an even more thorough view of the body than the strip/cavity search. Even *prisoners* "retain a right to bodily privacy, even if that right is limited by institutional security concerns." Nicholas v. Goord, 430 F.3d 652, 658 (2d Cir. 2005), *cert. denied*, 549 U.S. 953, 127 S.Ct. 384, 166 L.Ed.2d 270 (2006), *overruled on other grounds*, United States v. Anderson, 483 F.3d 73 (2d Cir. 2007). *See generally*, Hudson v. Palmer, 468 U.S. 517, 527, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393, 403 (1984) (explaining that an expectation of privacy for prisoners is

29

reasonable when the prisoner's interest is greater, in holding that privacy, than any legitimate governmental interest) (*See also*, Hartline v. Ohio, 546 F.3d 95, 100 (2d Cir. 2008) (requiring individualized, reasonable suspicion that the individual is "secreting contraband on [his or her] person" prior to allowing a strip search); Fortner v. Thomas, 983 F.2d 1024, 1030 (11th Cir. 1993) (recognizing prisoner's rights to bodily privacy "because most people have a special sense of privacy in their genitals and involuntary exposure of them in the presence of people... may be especially demeaning and humiliating'") (quoting Lee v. Downs, 641 F.2d 1117, 1119 (4th Cir. 1981)); Thompson v. County of Cook, 412 F. Supp. 2d 881, 893 (N.D. Ill. 2005) (determined that visual body cavity searches, x-rays, and urethral swabbing of all *prisoners* was improper)).

In Bell v. Wolfish, *supra*, the Supreme Court said that, among other requirements, body cavity searches are only constitutional if performed in a "reasonable manner". 441 U.S., at 560. Correctional officers must act reasonably when conducting a search because searches invade an inmate's privacy and can easily become abusive. Id., at 559-60. *See* Iqbal v. Hasty, 490 F.3d 143, 172 (2d Cir 2007) (finding that detainee stated a Fourth Amendment claim when he alleged that he was subjected to multiple strip searches and cavity searches that might be understood to be punishment and not related to any legitimate governmental purposes); Harris v. Ostrout, 65 F.3d 912, 916 (11th Cir. 1995) (stating that if strip searches "are devoid of penological merit and imposed simply to inflict pain, the federal courts must intervene," and that strip searches may not be used to retaliate against First Amendment-protected activity, such as the right of Access to the Courts); *C.f.* Lopez v. Youngblood, 609 F. Supp. 2d 1125, 1136 (E.D. Cal. 2009) (distinguishing a county jail's unreasonable blanket strip-search policy from the reasonable searches at a 'maximum security' facility, such as the one in Arruda v. Fair, 710 F.2d 886, 886-88 (1st Cir. 1983).

1  *PRIVATE PHONE CALLS*

2      The distinction of pretrial detainees from prisoners is essential throughout this case.

3  Most courts have made utility of the ruling in U.S. v. ___, 384 F.3d 38 (2d Cir. 2004),

4  when evaluating claims regarding the rights of prisoners to privacy during personal calls.

5  However, pretrial detainees have a more extensive reasonable expectation of privacy

6  protected by the Fourth Amendment, as indicated *supra*.

       This Court has determined that, when it comes to convicted prisoners, when a

8  notification is given that their calls are being monitored, by making the call, they are giving

9  consent to such monitoring. U.S. v. Footman, 215 F.3d 145, 155 (1st Cir. 2000).

10     The monitoring of the private phone calls of pretrial detainees presents not only a

11  violation of their reasonable expectations to privacy, but also forces such a violation upon

12  the loved ones whom they call. Their family and friends have a reasonable expectation of

13  privacy against the vicarious wiretapping of their phones and unwarranted recording of

14  their personal interactions by an arm of the state or its agents, especially when no party in

15  the call is convicted of any crime or subject to such a penalty by the state or its actors.

16     Furthermore, both the rights of a pretrial detainee and their relations are being

17  threatened by the unfair imposition of ridiculous pricing for phone calls which is far

18  beyond those that would be otherwise billed to them were the WCSO, and the company it

19  employs, not involved, rendering detainees into a source of commercial and public profit.

20  Byrd v. Goord, No. 00 civ2135, 2005 U.S. Dist. LEXIS 1854 (S.D.N.Y. Aug. 29, 2005)

21  (unpublished).

22

    Fifth Amendment Claims

24     The Fifth Amendment to the U.S. Constitution provides, in relevant part:

25          *"...nor shall private property be taken for public use, without just compensation."*

"The [WCSO] has charged Plaintiff over $67, allegedly as a deposit for used jail-issued clothing, linens, and a tote-bag" (Complaint, ¶ 72). This deposit is taken from any money that each inmate receives and must be satisfied prior to any of them is allowed to purchase anything at commissary, including stationery or stamps for sending letters, or even personal hygiene products such as deodorant or shampoo. No inmate ever receives any interest, nor is given any notice of how such interest accrued may be spent by the WCSO, despite the fact that it is his property. The constitutionality of this "deposit", especially when there are executive procedures in place to reimburse or pay correctional institutions to disburse clothing, bedding, and linens to inmates, is dubious. The materials issued to detainees upon arrival are used and deteriorated to the point of near unserviceability. The only true conceivable purpose of this "deposit" is a means to abuse the position of the WCSO over inmate finances and derive a considerable source of unmoderated income, when one considers the volume of deposits paid and how much interest may be accrued in the collection of such an amount.

Massachusetts General Law, Chapter 126, Section 33, reads:

*"The keeper of the jail ..... superintendent of the house of correction... shall, at the expense of the county, provide necessary fuel, bedding, and clothing for all prisoners in their custody upon charge or conviction of a crime against the commonwealth, and shall present to the auditor of Boston a full account of their charges so incurred or incurred for necessary furniture for such institutions, which, upon the allowance thereof by the auditor, shall be paid by the county."*

Since the abolition of county government in Massachusetts, the pay, allowance, and compensation now come from the state treasury.

However, clothing and bedding "deposits" are not the totality of the extent to which the WCSO exercises their power over inmate accounts. Somehow, the WCSO has modified the pricing of commissary items on the Keefe Commissary Network[R], used throughout

32

1   correctional institutions in the Commonwealth, to sometimes double, if not nearly triple,

    the prices of the same exact items as those sold in other institutions in the same network.

3   Even the phone calls, once again, are priced far beyond those of any correctional institution

4   in the Commonwealth. It seems to be a simple consequence of circumstances outside of

5   PLAINTIFF's control that he was detained in the WCJHOC and has had to spend thousands

    of dollars to survive the daily incidents of institution life and maintain contact with his

    family. Where a single pad of white-lined writing paper with less than 50 pages costs a

8   whole dollar before tax, there is an obvious departure from the costs in the community

9   without any justification outside of providing a means to punish unconvicted citizens or, at

    least, render them a source of revenue in uninspected cash-flow. What further

    incentive is needed for detaining citizens and 'maintaining custody' in the cheapest mode

12  possible, regardless of constitutional deprivations, when one readily has the unchallenged

13  authority to force them into any financial situation he desires?


15  **Retaliation**

16        PLAINTIFF brings several claims of retaliation (Complaint, ¶¶ 179-186).

17        To prevail on a claim of retaliation, an inmate must show "(1) a specific

    constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or

19  her exercise of that right, (3) a retaliatory adverse act, and (4) causation." McDonald v.

20  Stewart, 132 F.3d 225, 231 (5th Cir. 1998).

21        The specific constitutional rights which are being retaliated against are PLAINTIFF's

    right to grieve the conditions of his confinement and his right of Access to the Courts.

23        From withholding supplies to inhibiting mail, the WCSO has forayed into a campaign

24  of harassment against PLAINTIFF for the filing of a total of 25 grievances and the

25  subsequent rise of this action. The casual connection between the exercise of these rights

33

MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION        Case No.: 4:17-cv-40118-TSH

and the retaliatory adverse actions by WCSO agents is evidenced by the verbal conversations PLAINTIFF has had with WCSO staff during their frustration with his persistence in the just resolution of these issues (Complaint, ¶¶ 14, 116, & 122).

Even if the WCSO's actions, motivated by PLAINTIFF's exercise of his right to Access to the Courts, might have been legitimate if taken for a different reason, these claims are still actionable as retaliation. Woods v. Smith, 60 F.3d 1161 (5th Cir. 1995).

**B.    IRREPARABLE HARM HAS COME TO PLAINTIFF AND WILL COME TO SIMILARLY SITUATED PERSONS SHOULD NO INJUNCTION ISSUE**

All conditions for which PLAINTIFF is seeking a preliminary injunction, on behalf of himself and other similarly situated persons, since they all constantly present an uninterrupted constitutional violation or violation of state regulations that are designed with the standards of decency in mind, will continually cause irreparable harm to non-prisoners and, in consideration of some facts, will place any detainee in the Annex Building in mortal danger with the risk of his environment and the poorly trained staff around him.

It has repeatedly been recognized by the federal courts at all levels that a violation of constitutional rights constitutes irreparable harm as a matter of law. Elrod v. Burns, 427 U.S. 347, 373-374, 96 S. Ct. 2673, 2689-2690, 49 L. Ed. 2d 547 (1976); Deerfield Medical Center v. City of Deerfield Beach, 661 F.2d 328, 338 (5th Cir. 1981); Ross v. Meese, 818 F.2d 1132, 1135 (4th Cir. 1987); Milwaukee County Pavers Assn v. Fiedler, 707 F. Supp. 1016, 1031-1032 (WD Wis. 1989); Albro v. County of Onondaga, New York, 627 F. Supp. 1280, 1287 (N.D.N.Y. 1986); Walters v. Thompson, 615 F. Supp. 330, 341 (N.D. Ill. 1985).

Even if one of his individual claims do not rise to the level of constitutional scrutiny, "[a court] must examine the totality of the circumstances. Even if no single condition of confinement would be unconstitutional in itself, 'exposure to the cumulative effect of

1    prison conditions may subject inmates to cruel and unusual punishment.'" <u>Rhodes v.</u>

<u>Chapman</u>, 452 U.S. 363, n.2 (1981) (quoting <u>Laaman v. Helgemoe</u> 437 F. Supp. 269,

3    322-323 (D.N.H. 1977). *E.g.* <u>Williams v. Edwards</u>, 547 F.2d 1206 (5th Cir. 1977); <u>Gates v.</u>

4    <u>Collier</u>, 501 F.2d 1291 (5th Cir. 1974); <u>Finney v. Arkansas Board of Correction</u>, 505 F.2d 194

5    (8th Cir. 1974); <u>Pugh v. Locke</u>, 406 F. Supp. 318 (M.D. Ala. 1976); <u>Holt v. Sarver</u>, 309 F. Supp.

362 (E.D. Ark. 1970)

     A detainee's right to Access to the Courts is especially necessary in litigating against

8    the conditions of his confinement or his criminal defense. Any harm that results from a lack

9    of an injunction will be absolutely devastating.

     Retaliation against witnesses in this action, other than PLAINTIFF, have already

   occurred. This is evidenced by the assault and battery of PLAINTIFF's witness, Adam

12   Walker, by correctional officer Kevin Lynch, where after the unwarranted and spontaneous

13   use of force occurred, Ofc. Lynch indicated to Mr. Walker something akin to "sue me for it"

   (*See* Doc. 15). Retaliation is so common and rampantly practiced in the WCJHOC, that a

   majority of staff genuinely believe that their actions will forever escape judicial scrutiny.

16   Lacking any protection against it would facilitate further harm to be suffered by

   PLAINTIFF's witnesses, declarants, and the potential of future testimony by others.

19

20   **C.**    ***DE MINIMIS* HARM, IF ANY, WILL BE SUFFERED BY DEFENDANTS**

     DEFENDANTS would suffer little harm, if any, beyond a slight increase in proper

   spending, a loss in illegally obtained revenue, and less work on the part of certain staff

23   members. The harm that comes to PLAINTIFF and other detainees is far more severe than

24   the *de minimis* costs to DEFENDANTS and their respective agencies.

25

35

1
2      Administrative burdens and monetary expenses do not justify constitutional

violations. <u>Lopez v. Youngblood</u>, 609 F. Supp. 2d 1125 (E.D. Cal. 2009) & <u>Carty v. Turnbull</u>,

3      144 F. Supp. 2d 395    V.I. 2001).

4

5      **D.     THE PUBLIC INTEREST WILL BE GREATLY SERVED**

6      The constitutional detainment of any person and the precedent which this

establishes provide    r great cause that is extremely beneficial for the public interest since

8      detainees are not paying a penance to society and, therefore, their rights should be readily

9      defended as full-citizens when anyone, upon the very easily established requisite of

10     probable cause, can become a pretrial detainee. Anyone can be charged with a crime and

would be pleased to know that there is a safeguard in place to ensure that public offices are

12     not being abused and their rights are thoroughly protected in such a predicament. *See*

13     *Daryl J. Levinson*, <u>Making Government Pay: Markets, Politics and the Allocation of</u>

14     <u>Constitutional Costs</u>, 67 U. CHI. L. REV. 345, 416-17 (2000) (suggesting that courts should

rely more heavily on injunctions because they represent the "the best hope for preventing

16     constitutional violations") & *Myriam E. Gilles*, <u>In Defense of Making Government Pay: The</u>

17     <u>Deterrent Effect of Constitutional Tort Remedies</u>, 35 GA. L. REV. 845, 876 (2001)

18     (structural reform injunctions are a "uniquely appropriate remedial regime for

constitutional wro...    ).

20

21

22     **IV.    CONCLUSION.**

PLAINTIFF ... sufficiently established a likelihood of success on the merits of his

24     claims against the unconstitutional conditions of his pretrial detainment. PLAINTIFF has

25     established that he and other detainees have and will suffer irreparable harm should no

36

1   injunction issue, that Defendants will suffer *de minimis* harm, if any, and that the public

2   interest is greatly served by the issuance of interim relief.

3        As grounds therefore, PLAINTIFF respectfully requests that the Honorable Court

4   grant his motion for a preliminary injunction, fully or in part.

5

6   Dated this 8th day of December, 2017

                                    */s/ - Manuel Robert Lucero, V*

7                                       MANUEL ROBERT LUCERO, V, *pro se*
                                    809 Boston Turnpike Road
                                    Suite# 222
                                    Shrewsbury, MA 01545
                                    (559) 631-8372

9                                       mlucero@alu.norwich.edu

10

11

13

14

15

17

18

19

21

22

23

25

37

## CERTIFICATE OF SERVICE

I, **Manuel Robert** Lucero, **V,** hereby certify, under the pains and penalties of perjury, that on December 8, 20.. a true and correct copy of this MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION was sent via first-class mail, postage prepaid, to all defendants, or their counsel, at their addresses of record.

Executed at Shrewsbury, Massachusetts,
on December 8th, 2017

                                        */s/ - Manuel Robert Lucero, V*
                                        MANUEL ROBERT LUCERO, V

MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION          Case No.: 4:17-cv-40118-TSH